# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,    )    CIVIL ACTION NO. 6:14-CV· 501-ORL-37DAB
AND THE STATE OF FLORIDA,    )
EX REL. [UNDER SEAL]    )
    )
    Plaintiffs,    )
    )
    v.    )
    )
[UNDER SEAL]    )    FILED IN CAMERA AND
    )    UNDER SEAL
    )
    )    **DO NOT PLACE ON PACER**
    )
    Defendants.    )    JURY TRIAL DEMANDED

## DOCUMENT TO BE KEPT UNDER SEAL

S-1

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>THE STATE OF FLORIDA,<br>EX REL. JOHN DOE. | )<br>)<br>)<br>) | CIVIL ACTION NO. *6:14-CV-501-ORL-37DAB* |
| Plaintiffs, | )<br>) | |
| v. | )<br>) | |
| HEALTH FIRST, INC., HEALTH FIRST<br>HEALTH PLANS INC., HEALTH FIRST<br>MEDICAL GROUP, MELBOURNE<br>INTERNAL MEDICINE ASSOCIATES,<br>P.A., HOLMES REGIONAL<br>MEDICAL CENTER,<br>PALM BAY HOSPITAL,<br>CAPE CANAVERAL HOSPITAL<br>AND VIERA HOSPITAL | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | FILED IN CAMERA AND<br>UNDER SEAL<br><br>DO NOT PLACE ON PACER |
| Defendants. | )<br>) | JURY TRIAL DEMANDED |

## COMPLAINT FOR DAMAGES AND OTHER RELIEF
## UNDER THE QUI TAM PROVISIONS OF THE
## FEDERAL FALSE CLAIMS ACT [31 U.S.C. § 3729 *et seq.*]
## AND THE FLORIDA FALSE CLAIMS ACT [Fla. Stat. § 68.081 *et seq.*

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................... 1

II.   PARTIES .................................................................................................................. 2

    A.    Plaintiffs ......................................................................................................... 2

    B.    Defendants ...................................................................................................... 5

III.  JURISDICTION AND VENUE ............................................................................... 7

IV.   THE LAW ................................................................................................................ 7

    A.    The Federal False Claims Act and Florida False Claims Act ......................... 7

    B.    The Anti-Kickback Statute ............................................................................. 8

        1.    Violations of the Anti-Kickback Statute Can Form the Basis of
            FCA Liability ....................................................................................... 10

    C.    The Stark Act ................................................................................................ 11

        1.    Violations of the Stark Act Can Form the Basis of FCA Liability ........... 12

V.    DEFENDANTS' ILLEGAL AND FRAUDULENT PRACTICES ................................ 13

    A.    Health First Acted to Induce MIMA Physicians to Refer Government Insured
        Patients in Violation of the Anti-Kickback Statute............................................ 13

        1.    Health First Used Melbourne Same-Day Surgery to Pay Kickbacks in
            Various Forms to Induce MIMA and Other Physicians to Refer
            Government Insured Patients to Health First Facilities ............................ 13

            a.    Health First Offered Ownership of Melbourne Same-Day
                Surgery to MIMA Physicians in Exchange for Referrals ............. 13

            b.    MSDS Paid MIMA Physicians as Medical Directors of MSDS
                in Exchange for Referrals ............................................................ 16

            c.    In 2013, Health First Bought Out MIMA's Ownership Interest
                in MSDS at a Price Far in Excess of Fair Market Value .............. 16

        2.    Health First Used Melbourne GI Center to Induce MIMA to Refer
            Exclusively to Health First Hospitals ...................................................... 17

        3.    Health First Granted Medical Directorships at Hospice of Health First
            to MIMA Physicians to Induce Referrals to Health First Facilities.......... 18

        4.    Health First Induced MIMA Physicians to Refer Patients to Its Palm
            Bay Community Hospital ......................................................................... 20

        5.    Health First Acted to Benefit MIMA's Radiation Therapy Facility to
            Induce MIMA Physicians to Refer Patients to Health First Facilities ...... 20

        6.    Health First Provided Extra Services to MIMA Physicians Working
            at its Holmes Regional Medical Center to Induce Referrals to that
            Hospital .................................................................................................. 21

7.   Health First Provided MIMA and Other Physician Offices with Blood Products at No Charge to Induce Referrals .................................................. 22

8.   Health First Provided Other Exclusive Benefits to MIMA Physicians ..... 24

9.   Health First Acquired MIMA Far In Excess of Fair Market Value .......... 25

B.   Health First Sells Geographic Exclusivity to Certain Physician Subspecialty Groups through Inflated Lease Arrangements, in violation of the Anti-Kickback Statute .................................................................................................................... 27

C.   Health First and MIMA, as Owners of Medical Facilities, Each Engaged in Self-Referrals in Violation of The Stark Law .................................................. 28

1.   HFHP Refers its Plan Participants Exclusively to MSDS, which Health First Partially Owns ................................................................................ 28

2.   MIMA Refers its Patients Exclusively to MSDS, which it Partially Owns ............................................................................................................ 29

3.   HFHP Refers its Plan Participants Exclusively to Melbourne GI Center, which it Partially Owns .................................................................. 30

4.   MIMA Refers its Patients Exclusively to Melbourne GI Center, which it Partially Owns .................................................................................. 30

D.   Health First Knowingly Directly Presented False Claims to the Government ..... 30

1.   Health First Forced its Hospital Inpatients to Get PET Scans at Health First Outpatient Facilities so it Could Bill Separately for those Scans ..... 30

2.   HF Hospice Discharged Hospice Patients to be Treated at Health First Hospitals on a Fee for Service Basis under Medicare Part B .................. 33

3.   Health First Required Patients to Receive Blood Transfusions as Inpatients, a Practice Known as Flipping .................................................. 34

E.   Health First Failed to Maintain the Required Quality Assessment & Performance Program and Failed to Adequately Track and Report Adverse Patient Events ........................................................................................................ 37

VI.   COUNTS ...................................................................................................................... 39

On behalf of the United States of America and the State of Florida, plaintiff-relator John Doe ("Relator") brings this action against Health First, Inc., Health First Health Plans Inc., Melbourne Internal Medicine Associates. P.A, Holmes Regional Medical Center, Palm Bay Hospital, Cape Canaveral Hospital, Viera Hospital and Health First Medical Group (collectively, "Defendants") for violations of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* and the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*

## I.   INTRODUCTION

1.     This is an action to recover damages and civil penalties on behalf of the United States of America and the State of Florida arising from false and/or fraudulent statements, records, and claims made by Defendants in violation of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*, Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b, and The Stark Act, 42 U.S.C. § 1395nn.

2.     The allegations, inter alia, involve fraudulent billing for services rendered that resulted from referrals made by physicians who were paid kickbacks in a variety of forms to induce them to make those referrals, beginning in 1999 and continuing through February 2013 ("the relevant time period").

3.     In violation of the AKS, Health First provided kickbacks and incentives for referrals to the physicians of Melbourne Internal Medicine Associates ("MIMA") by: (i) granting them the exclusive ability to invest in and own portions of subspecialty healthcare facilities that ultimately proved very profitable; (ii) paying them as Medical Directors of its outpatient surgery center, hospital programs and hospice center for little or no work performed; (iii) offering them exclusive benefits related to patient admissions to Health First hospitals; (iv) using its insurance subsidiary, Health First Health Plans, as a lever by causing it to reimburse MIMA for radiation therapy at MIMA's radiation facility while closing its own radiation therapy center, in exchange

1

for referrals; (v) supplying blood products at no cost; (vi) giving MIMA doctors exclusive benefits related to radiation therapy, cardiac catheterization, and call coverage, and (vii) ultimately buying the entire MIMA practice, and its ownership in the subspecialty centers, for exorbitant sums greatly in excess of fair market value.

4.      In violation of the Stark Law prohibiting physician self-referrals, Defendants consistently referred patients to medical facilities in which they held an ownership interest: Health First to the outpatient surgery center and gastrointestinal (GI) center, and MIMA separately to the outpatient surgery center and gastrointestinal (GI) center.

5.      In addition, Health First directly violated the FCA by: (i) forcing its hospital inpatients in need of PET scans to be discharged to receive those scans at Health First facilities as outpatients so it could bill separately for those scans; (2) discharging inpatient hospice patients in its HF Hospice to be admitted to Health First hospitals to be treated on a fee for service basis under Medicare Part B; and (3) "flipping" patients from observation to inpatient status for blood transfusions.

6.      In sum, Defendants knowingly billed federal health care programs for claims which were tainted by violations of the AKS and The Stark Act and directly violated the FCA.

7.      These claims caused damages to the federal health care programs, and the amount overbilled to the federal health care programs could be at least over $100 million in damages per year.

## II.      PARTIES

### A.      Plaintiffs

8.      The United States is a plaintiff to this action on behalf of the Department of Health and Human Services ("HHS"), the Centers for Medicare and Medicaid Services ("CMS"),

and other federally funded health care programs including Medicare, Medicaid, TRICARE and the Veterans Administration.

9.     Medicare is a government health insurance program for those 65 years or older, and those with certain disabilities. 42 U.S.C. §§ 426, 426A.  Medicare is administered by CMS, which is part of HHS.   CMS contracts with private contractors referred to as "fiscal intermediaries," "carriers," and "Medicare Administrative Contractors" ("MAC"), to act as agents in reviewing and paying claims submitted by healthcare providers.  *See* 42 U.S.C. § 1395h; 42 C.F.R. §§ 421.3, 421.100.   Upon information and belief, throughout the relevant time period, the Medicare Part B MAC for Florida has been First Coast Service Options, Inc.

10.     In order to participate in the Medicare Program as a provider of medical or other health services, providers/suppliers must submit an enrollment application to CMS. This application includes a certification that the provider/supplier will abide by all applicable Medicare laws, regulations, and program instructions, and that payment of a claim by Medicare is conditioned upon the claim and its underlying transaction complying with such laws, regulations, and program instructions.   *See* Form CMS-855B, "Medicare Enrollment Application: Clinics/Group Practices and other Suppliers," p.30; Form CMS-855S, "Medicare Enrollment Application: Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS) Suppliers," p.31.

11.     The Medicaid Program, 42 U.S.C. § 1396 *et seq.*, is a government health insurance program funded jointly by the federal and state governments.  Each State administers its own Medicaid program, but the State's programs are governed by federal statutes, regulations and guidelines.   The federal portion of States' Medicaid payments, the Federal Medical Assistance Percentage, is based on a State's per capita income compared to the national average.

During the relevant time period, the federal portion consisted of a minimum of 50% up to a maximum of roughly 80%.

12.     An entity that wishes to participate in Florida's Medicaid program as a provider of medical or other health services must sign an agreement which includes a certification of compliance with all, "local, state, and federal laws, as well as rules, regulations, and statements of policy applicable to the Medicaid program[.]" Florida Agency for Health Care Administration, Non-Institutional Medicaid Provider Agreement, para. 3.

13.     TRICARE is a federally funded program that provides medical benefits to military personnel, their families, retired veterans, and reservists called to duty.  32 C.F.R. § 199 *et seq.*  Although TRICARE is administered by the Secretary of Defense, the regulatory authority establishing the TRICARE program provides reimbursement to individual health care providers applying the same reimbursement requirements and coding parameters that the Medicare program applies. 10 U.S.C. §§ 1079(j)(2) (institutional providers), (h)(1) (individual health care professionals) (citing 42 U.S.C. § 1395, *et seq.*).  Like Medicare and Medicaid, TRICARE will pay only for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." 32 C.F.R. § 199.4(a)(1)(i).  Like the Medicare Program and the Medicaid Program, TRICARE prohibits practices such as submitting claims for services that are not medically necessary, consistently furnishing medical services that do not meet accepted standards of care, and failing to maintain adequate medical records. 32 C.F.R. §§ 199.9(b)(3)-(b)(5).

14.     The Veterans Administration is a federally funded and administered program which provides medical benefits to military veterans and their dependents.

4

15.     Throughout the relevant time period, Defendants submitted false or fraudulent claims to Medicare, Medicaid and other federal health care programs for the fraudulent conduct alleged herein.

16.     The State of Florida is a plaintiff in this action.  Throughout the relevant time periods specified herein, Defendants submitted false or fraudulent claims to Florida Medicaid for the fraudulent conduct alleged herein.

17.     Relator John Doe is a resident of Brevard County, Florida.  The allegations in this complaint are based upon information Relator discovered through his work and through his own personal efforts, observations and investigation.

**B.      Defendants**

18.     Defendant Health First, Inc. ("Health First"), founded in 1995 as a not-for-profit holding company, is headquartered at 6450 US Highway 1, Rockledge, FL 32955 and employs over 7,500 people.  Health First is an integrated health system that owns four hospitals (Holmes Regional Medical Center, Palm Bay Hospital, Cape Canaveral Hospital and Viera Hospital), the area's only Trauma and Heart Centers and four fitness centers.  Health First also offers multiple commercial and Medicare health plans through its wholly owned subsidiary Health First Health Plans Inc.  It has acquired and now wholly owns the largest multi-specialty physician group in Brevard County, formerly known as Melbourne Internal Medicine Associates prior to the acquisition and now known as Health First Medical Group. Health First earns revenues in excess of $1 billion per year.

19.     Defendant Holmes Regional Medical Center (HRMC), located at 1350 South Hickory Street, Melbourne, Florida 32901, is owned by Health First and has 514 beds and more than 500 Medical Staff members.

5

20.     Defendant Palm Bay Hospital, located at 1425 Malabar Road NE Palm Bay, Florida 32907, is owned by Health First and has 152 beds and more than 195 physicians.

21.     Defendant Cape Canaveral Hospital, located at 701 W Cocoa Beach Causeway, Cocoa Beach, Florida 32931, is owned by Health First and has 150 beds and more than 240 Medical Staff members.

22.     Defendant Viera Hospital, located at 8731 N Wickham Rd, Viera, Florida 32940, is owned by Health First and is an 84 bed acute care facility.

23.     Defendant Health First Health Plans Inc. ("HFHP") is located at 6450 US Highway 1, Rockledge, FL 32955 and offers multiple commercial and Medicare health plans in Brevard, Indian River, Flagler and Volusia Counties.  It is the largest health insurance provider in Brevard County.

24.     Defendant Melbourne Internal Medicine Associates. P.A. ("MIMA") is headquartered at 1223 Gateway Drive, Melbourne, FL 32901.  MIMA was the largest multi-specialty physician group in Brevard County, with 16 physician offices, ancillary services, and walk-in clinic locations throughout Central and South Brevard County.  Since its founding in 1969, MIMA expanded to 137 physicians in 31 specialties, including cardiology, dermatology, endocrinology, ENT, family practice, gastroenterology, general surgery, hematology/oncology, infectious diseases, internal medicine, nephrology, neurology, OB/GYN, orthopaedics, pathology, pediatrics, physician medicine and rehabilitation, radiology, rheumatology, sleep medicine, urology, and weight loss surgery. It was acquired in February 2013 by Health First and is now known as Health First Medical Group, employing over 250 physician providers.

25.     Defendant Health First Medical Group, headquartered at 6450 US Highway 1, Rockledge, FL 32955, is the successor entity to MIMA after MIMA was acquired by Health First in February 2013.

## III.    JURISDICTION AND VENUE

26.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732.

27.     This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) and because Defendants transact business in the Middle District of Florida.

28.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because all Defendants can be found in, reside in, and transact business in the Middle District of Florida.  In addition, the False Claims Act violations, as alleged herein, occurred, and continue to occur, in this District.

## IV.    THE LAW

### A.     The Federal False Claims Act and Florida False Claims Act

29.     The Federal False Claims Act ("FCA") provides, among other things, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" is liable to the United States for a civil monetary penalty plus treble damages.  31 U.S.C. §§ 3729(a)(1)(A)-(B).

30.     The term "knowingly" means "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. §§ 3729(b)(1)(A)(i)-(iii). Proof of specific intent to defraud is not required.  31 U.S.C. § 3729(b)(1)(B).

31.     The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded ...." 31 U.S.C. §§ 3729(b)(2)(A)(i)-(ii).

32.     "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

33.     The Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*, is modeled after the Federal FCA, and contains provisions similar to those quoted above.   Relator asserts claims under the Florida False Claims Act for the state portion of the Medicaid false claims detailed in this complaint.

**B.     The Anti-Kickback Statute**

34.     The federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b, makes it a criminal offense to "knowingly and willfully" offer, pay, solicit, or receive any remuneration to induce, or in return for, referrals of items or services paid for by a Federal health care program. If *any* purpose of the remuneration is to induce or reward the referral or recommendation of business payable in whole or in part by a federal health care program, the AKS is violated, *i.e.,* a lawful purpose will not legitimize a remuneration that also has an unlawful purpose.

1.     Specifically, the AKS provides:

(1)     whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

(A)    in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program. . . .

(B)    in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program

\*   \*   \*

(2)    whoever knowingly and willfully offers and pays any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A)    to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

(B)    to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program . . . .

42 U.S.C. § 1320a-7b(b).

35.    Specific intent is not required to establish a violation of the AKS. That is, "a person need not have actual knowledge of [the AKS] or specific intent to commit a violation of [the AKS]." 42 U.S.C. § 1320(a)-7b(h)).

36.    A "Federal health care program" is defined at 42 U.S.C. § 1320a-7b(f) as any plan or program providing health benefits funded, whether directly or indirectly, by the United States Government. The Anti-Kickback Statute applies to funds received by Defendants from government healthcare programs, including Medicare, TRICARE, the Veterans Administration, and Medicaid, through the State of Florida.

37.     Violation of the statute can subject the perpetrator to exclusion from participation in federal healthcare programs and civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

38.     None of the "safe harbors" to the AKS are applicable here. *See* 42 C.F.R. § 1001.952.

### 1.     Violations of the Anti-Kickback Statute Can Form the Basis of FCA Liability

39.     Congress has long viewed the elimination of kickbacks as central to any efforts to combat Medicare fraud and abuse. *See United States v. Greber*, 760 F.2d 68, 70-71 (3d Cir. 1985). Because kickback schemes usurp the physician's independent medical judgment and thereby negatively affect the integrity of Federal healthcare programs, the United States has a strong interest in ensuring the continued viability of False Claims Act actions to deter and redress healthcare fraud predicated upon kickbacks. *United States ex rel. Charles Wilkins and Daryl Willis v. United Health Group, Inc. et al.*, (3d Cir. 2010) (No. 10-2747) (Brief for the United States as Amicus Curie Supporting Appellant) ("Amicus Brief"). To protect against the erosion of patient care and patient safety, courts uniformly agree that compliance with the AKS is a material condition of payment under Medicare and Medicaid.[1]

40.     Moreover, these and other courts have held that a person or entity who violates the AKS and submits a claim or causes another to do so has violated the False Claims Act

---

[1] *See United States et al. ex rel. Westmoreland v. Amgen Inc.*, 2011 U.S. App. LEXIS 15036 (1st Cir. July 22, 2011); *United States ex rel. Hutcheson v. Blackstone Medical, Inc.*, 2011 U.S. App. LEXIS 10972 (1st Cir. June 1, 2011); *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 243 (3d Cir. 2004); *United States ex rel. Conner v. Salina Regional Health Ctr.*, 543 F.3d 1211, 1223 n.8 (10th Cir. 2008); *United States ex rel. McNutt v. Haleyville Medical Supplies*, 423 F.3d 1256, 1259-1260 (11th Cir. 2005); *United States v. Rogan*, 459 F. Supp. 2d 692, 717 (N.D. Ill. 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008).

regardless of what form the claim or statement takes.  Many of these courts have reasoned that the claims are false, and thus violate the FCA, because there is a false certification – either express or implied – as to compliance with the AKS each time a claim is submitted.[2]

41.     Defendants violated the AKS by offering remuneration and incentives, in various form, to MIMA physicians to induce those physicians to make referrals to Health First facilities for health services payable by Medicare.  Medicare does not cover items that are provided because of illegal inducements, and all claims for payment for those items are false.

42.     More recently, in 2010, under the Patient Protection and Affordable Care Act, Congress amended the AKS to expressly clarify that a violation of the AKS constitutes a "false or fraudulent" claim under the False Claims Act.  (42 U.S.C. § 1320(a)-7b(g)).  This clarifying amendment was consistent with prior Congressional intent and case law, as cited above.

**C.     The Stark Act**

43.     The Stark Act, 42 U.S.C. § 1395nn, states that if a physician or a member of his immediate family has a "financial relationship" with an entity providing healthcare services:

> (a) the physician may not make a referral to the entity for the furnishing of designated health services . . . and
> (b) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn(a)(1).

---

[2] *See, e.g., United States v. Rogan,* 157 F.3d 449, 452 (7th Cir. 2008); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899, 902 (5th Cir. 1997); *United States ex rel. Schmidt v. Zimmer, Inc.,* 386 F.3d 235, 245 (3d Cir. 2004); *Mason v. Medline Industries, Inc.,* 2010 WL 653542, at *5-9 (N.D. Ill. Feb. 18 2010); *United States ex rel. Jamison v. McKesson Corp.,* 2009 WL 3176168 (N.D. Miss. Sept. 29, 2009); *In re Pharmaceutical Indus. Average Wholesale Price Litig.,* 491 F. Supp. 2d 12, 17-18 (D. Mass. 2007); *United States ex rel Bidani v. Lewis,* 264 F. Supp. 2d 612, 615-16; *United States ex rel. Franklin v. Parke-Davis* 2003 WL 20048255 (D. Mass. Aug. 22, 2003); *United States ex rel. Pogue v. Diabetes Treatment Centers of America,* 238 F. Supp. 2d 258, 264 (D.D.C. 2002); and *United States ex rel. Bartlett v. Tyrone Hospital, Inc.,* 234 F.R.D. 113, 121 (W.D. Pa. 2001).

44.     The regulations implementing the Stark Act state that a "financial relationship" may include "a direct or indirect compensation arrangement . . . with an entity that furnishes [designated health services]." 42 C.F.R. § 411.354(a)(1)(ii).  A "compensation arrangement," in turn, can be "any arrangement involving remuneration, direct or indirect, between a physician . . . and an entity." *Id*. at § 411.354(c).

45.     Hence, if a health care entity pays any form of remuneration to a physician, a compensation arrangement exists between them, resulting in a prohibition of physician referrals to the entity. *See id*. § 1395nn(a)(2)(B), (h)(1)(B).  Any "request by a physician for an item or service" qualifies as a referral. *Id*. § 1395nn(h)(5)(A).

### 1.     Violations of the Stark Act Can Form the Basis of FCA Liability

46.     Defendants violated Stark Law by referring patients to facilities with which they had a financial relationship. Compliance with the Stark Law is a precondition to payment from Medicare.

47.     Each of the claims submitted to Medicare for reimbursement of health services provided to beneficiaries, was accompanied by an express or implied certification that the transaction was not in violation of federal or state statutes, regulations, or program rules.  Each of those certifications was false, because each claim for payment was tainted by the violations of the Stark Act detailed in this Complaint.  Falsely certifying compliance with the Stark or Anti-Kickback Acts in connection with a claim submitted to a federally funded insurance program is actionable under the FCA. *See United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 243 (3d Cir. 2004) (citing *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997)); *United States v. Rogan*, 459 F.Supp.2d 692, 717 (N.D. Ill. 2006); *United States v. Halifax Hosp. Med. Ctr.*, 2012 WL 921147, at *3 (M.D. Fla. Mar. 19, 2012).

12

## V.   DEFENDANTS' ILLEGAL AND FRAUDULENT PRACTICES

### A.   Health First Acted to Induce MIMA Physicians to Refer Government Insured Patients in Violation of the Anti-Kickback Statute.

48.     Health First has engaged and continues to engage in a variety of schemes and strategies to ensure that MIMA, the largest physician group in the Melbourne area, refers government insured patients to Health First facilities.  These schemes and strategies have proven successful.  More than 99% of patients admitted by MIMA physicians are admitted to Health First facilities.  This is true despite the presence of another hospital (Wuesthoff Hospital Melbourne) just 2.5 miles from MIMA's main location and closer to MIMA than any Health First facility.

#### 1.   Health First Used Melbourne Same-Day Surgery to Pay Kickbacks in Various Forms to Induce MIMA and Other Physicians to Refer Government Insured Patients to Health First Facilities

##### a.   Health First Offered Ownership of Melbourne Same-Day Surgery to MIMA Physicians in Exchange for Referrals

49.     Melbourne Same-Day Surgery (MSDS) is an outpatient ambulatory surgical center located at 1035 South Apollo Blvd., Melbourne, FL 32901.  MSDS was originally established at Health First hospital Holmes Regional Medical Center, Inc. (HRMC) by Health First and was 100% owned by Heath First. In 1999, the ownership structure was altered and the facility was sold to a consortium of medical providers who, while sharing in the profits of MSDS, had the ability to refer patients to Health First.

50.     In 1999, Health First established a limited partnership named Doctor's Surgical Partnership, Ltd. to purchase a freestanding ambulatory surgical center in Melbourne from Holmes Regional Medical Center and to then own and operate it under the name MSDS. The general partner was Physicians Surgical Partnership, Inc.  The shareholders of the General Partner were MIMA and Brevard Orthopaedic Clinic, Inc.

13

51.     There were 100 limited partnership interests in Doctor's Surgical Partnership, Ltd. that were sold by Health First to limited partners for $23,900 per share. MIMA was allowed to purchase 40 limited partnership units of Doctor's Surgical Partnership. Brevard Orthopaedic Clinic, Inc., headed by Dr. Richard Hynes, was allowed to purchase 25 units and Health First Physicians, Inc. purchased 22 units. The GP retained 1 unit. Certain independent physicians were offered the remaining 12 units. Osler Medical Group purchased 10 of these remaining units.

52.     The president of MSDS was initially Pete Zabinski, MD and later Joe Gurri, MD, both MIMA physicians. MSDS is managed by Health First, for which it receives a percentage of MSDS' revenues. Upon information and belief, for the last 3 years, MSDS has returned approximately 8% per share per year on the initial $23,900 per share investment.

53.     Health First offered the opportunity to purchase units and participate in the profits of MSDS in order to induce MIMA and other unit holder physicians to refer, and rewarded them for their continued referrals, to Health First hospitals. Those physicians, through their direct ownership of MIMA, participated in those MSDS profits that were paid as dividends on the limited partnership interests owned by MIMA.

54.     In 1998, MIMA originally began to pursue plans to construct its own surgery center. Larry Garrison, COO of Health First, marketed the opportunity to joint venture in a different new surgery center to area physicians in attempt to block this.  Relator met with Garrison in person, and Garrison stated that Health First would offer Omni Medical the opportunity to purchase only two shares in such a joint venture because of Omni's limited ability to refer patients based on the size of the Omni practice at the time.  Garrison expressed the understanding that any investor would be required to refer all of his or her patients to the surgery center and nowhere else. At the time, Omni Healthcare already had an investment in another

14

outpatient surgery center – Sheridan Surgery Center.   Because some Omni physicians had privileges and operated at Sheridan, and some Omni surgeons had an investment interest in Sheridan, Garrison said he would not allow Omni to own more than two shares in the proposed new surgery center.  Relator met with Garrison a total of three times regarding this proposal, and ultimately decided not to invest. Scott Seminer, MD, the president of Omni Healthcare, and Dave Mathias Esq., Health First's General Counsel, were also present at these meetings, which were held at Health First Physician's office.

55.     When offering an ownership interest in MSDS to a medical group, Health First based the number of limited partnership units offered on the number of surgeons in that medical group, the overall size of that medical group, and the overall number of referable procedures performed annually by the group. Because Health First owned all of the hospitals in South Brevard County (Melbourne and Palm Bay) in 1999, Health First had direct access to such information, including the number of procedures each physician performed.

56.     Health First made MIMA's investment in MSDS even more valuable by having its medical insurance subsidiary, HFHP, require that HFHP plan participants utilize MSDS exclusively.   In a letter dated June 14, 2002, from the HFHP Vice President of Operations Margaret Haney to OMNI Healthcare COO Tom Menichino, Haney wrote "HFHP contracts only with HRMC, Melbourne Same Day Surgery Center and Melbourne GI Center for outpatient surgery and endoscopy."

57.     On January 5, 2006, Brian Ulery, COO of Omni Healthcare at the time, spoke with Margaret Haney who informed him that Health First, as a partner in MSDS, signed a non-competition agreement that prohibits HFHP from forming any insurance reimbursement arrangement with a competing surgery center.

58.     In a letter dated March 9, 2006, from Margaret Haney, President and Chief

Operating Officer of HFHP to Brian Ulery of Omni Healthcare, Ms. Haney stated:

> I have received your letter of February 21, 2006 requesting that I reconsider our
> decision not to contract with Sheridan Surgery Center.  As I have discussed with
> OMNI representatives on numerous occasions, Health First's current contract
> with Melbourne Same Day Surgery Center prohibits such an agreement."

### b.      MSDS Paid MIMA Physicians as Medical Directors of MSDS in Exchange for Referrals

59.     To further induce referrals of government insured patients to Health First facilities

and to MSDS itself, MSDS employs MIMA physicians as medical directors and pays them

exorbitantly for little or no work. For example, Dr. Joseph Gurri, currently the COO of MIMA,

was paid $50,000 annually from 2000 through at least 2011 as the part time Medical Director of

MSDS when he was a MIMA physician/administrator, for performing minimal if any duties in

exchange for referring to patients to Health First facilities and compelling MIMA physicians to

utilize MSDS exclusively.

### c.      In 2013, Health First Bought Out MIMA's Ownership Interest in MSDS at a Price Far in Excess of Fair Market Value

60.     In 2013, in conjunction with Health First's acquisition of MIMA, Health First

purchased MIMA's 40 limited partnership units in MSDS for $100,000 per unit, significantly in

excess of their fair market value, in exchange for their ongoing stream of patient referrals.  Upon

information and belief, the then current fair market value per unit was at most approximately

$30,000 to $35,000. Such units had sold privately in the several years prior at $25,000 to

$30,000 per unit.

61.     Health First refused to purchase the MSDS units of any other MSDS unit holders

on the same terms, if at all, that it had offered to MIMA. Dr. Richard Hynes of Brevard

Orthopaedic Clinic objected to this in a February 14, 2013 letter he wrote to Lynne Stoldt of

MSDS.  In fact, Health First offered to purchase Brevard Orthopaedic Clinic's units in MSDS at substantially less - $23,900 - just two years earlier.  Additionally, Health First sent a letter of intent dated September 14, 2011 to Dr. Martin Lenoci of Physicians Development Group d/b/a Osler Medical, offering to purchase Osler's 20 units in MSDS for $27,000 per unit.

### 2. Health First Used Melbourne GI Center to Induce MIMA to Refer Exclusively to Health First Hospitals

62.    In 2002, Health First founded the Melbourne GI Center as a limited partnership named Doctors GI Partnership Ltd. The General Partner of the limited partnership is Physicians GI Partnership, Inc.   The President of the General Partner was MIMA surgeon Joseph Gurri, MD (2002-2012) and since 2013 has been MIMA GI doctor Gita Koshi, MD.

63.    Health First allowed MIMA to purchase a 40% ownership of Doctors GI Partnership Ltd. in order to induce MIMA physicians to refer patients to Health First facilities and to the GI Center itself.  This arrangement has since generated millions of dollars to MIMA and its physicians.  Osler owns 20% and Health First owns the remaining 40% and also manages the facility.  The physician groups who were offered the opportunity to purchase limited partnership units were only those who agreed to refer cases to Health First facilities. No other community physicians were permitted to participate in this arrangement because they had preexisting relationships with other centers where GI procedures were performed. Prior to the creation of this facility, MIMA physicians performed their GI procedures at Holmes Regional Medical Center, in which MIMA had no ownership interest.

64.    Scott Seminer, MD, the president of Omni Healthcare, called Larry Garrison, COO of Health First, requesting the opportunity for Omni to invest in the GI Center and was told that Health First was not interested in having Omni participate because Omni would not agree to

refer exclusively to the GI Center. Relator, on behalf of Omni, called Jerry Senne, President of HRMC, and reiterated the same request but was rebuffed as well.

65.     In addition, HFHP required all plan beneficiaries to have all GI procedures performed at Melbourne GI Center or Holmes Regional Medical Center, refusing to contract with any other competing facility. In a letter dated June 14, 2002, from HFHP Vice President of Operations Margaret Haney to OMNI Healthcare COO Tom Menichino, Haney wrote "HFHP contracts only with HRMC, Melbourne Same Day Surgery Center and Melbourne GI Center for outpatient surgery and endoscopy." This increased the revenues to MIMA as equity owners and further induced MIMA to refer to Health First hospitals.

66.     Non-MIMA physicians were not permitted to purchase units in the Melbourne GI Center unless they agreed to refer all of their patients requiring GI procedures there. Those who did agree did so verbally. Physicians from MIMA, Osler Medical Group and Health First Physicians were the only unitholders.

67.     MIMA physicians have non-competition clauses in their Subscription Agreements to purchase limited partnership interests in Doctors GI Partnership Ltd. preventing ownership in any competing GI centers.

### 3.     Health First Granted Medical Directorships at Hospice of Health First to MIMA Physicians to Induce Referrals to Health First Facilities

68.     Hospice of Health First (HF Hospice) is Brevard County's leading provider of hospice care and has been operating for over 35 years. It is located at 1900 Dairy Road, Melbourne FL 32904 and is 100% owned by Health First. Relator volunteered for no pay as a HF Hospice Director in 1989.

69.     Over the past ten years, Health First has appointed MIMA physicians as medical directors of the HF Hospice, paying them stipends for little or no work. In exchange, MIMA

18

physicians are expected to, and do, refer patients exclusively to the HF Hospice despite numerous other hospice organizations in Brevard County, including Vitas Hospice, Brevard Hospice, and St. Francis Hospice.

70.     All medical directors at the HF Hospice are employed by MIMA.  In 2009, MIMA physician John Campbell was paid $225,000 per year for part time work as a Hospice Medical Director.  Currently, MIMA physician Rudy Ruiz serves as one of the HF Hospice Medical Directors for a stipend of over $225,000 per year, in addition to serving in two other full time employment positions – as Chief Operating Officer of MIMA and as a full time MIMA physician. Other examples of HF Hospice Medical Directors who were paid excessive stipends that bear no relationship to the amount of work performed but are instead disguised payments to refer patients include Allen Condo, MD and Robert Seelman, MD.

71.     These medical directors give 50% of these stipends to the medical group that employs them.  Thus, these stipends benefit all of the MIMA physicians and they are similarly induced to refer patients to HF Hospice and other Health First facilities.

72.     Based on his personal knowledge from having once been a Director at HF Hospice and recent communications with employees of HF Hospice, Vitas Hospice, Hospice of St Francis and Brevard Hospice, Relator has ascertained that Health First does not permit patients who are hospitalized at Health First hospitals to be referred to other hospices, regardless of who the treating physician is. Health First hospital employees and MIMA physicians simply steer inpatient hospice referrals to the HF Hospice only.

73.     Physicians with patients in a Health First hospital who have had those patients demand a referral to Vitas Hospice and who have written the requested referral to Vitas have

seen those patients admitted instead to HF Hospice. Such physicians include Drs. Peter Marzano, Mohan Shah and Fred Peterson.

### 4. Health First Induced MIMA Physicians to Refer Patients to Its Palm Bay Community Hospital

74.     In 2002, MIMA physicians began taking leaves of absence and ultimately resigning from the medical staff of Palm Bay Community Hospital (PBCH), a 60 bed satellite hospital of Holmes Regional Medical Center.   In an effort to stymie the outflow and induce MIMA physicians to stay at PBCH and continue to admit patients, Health First responded by creating an "Admitting Program" with MIMA internists pursuant to which four MIMA internists agreed, in addition to caring for their own patients, to care for unassigned patients (who could possibly be uninsured) and admit them from the PBCH emergency room into the PBCH hospital under their care, in exchange for exorbitant payments of over $250,000 to MIMA. This arrangement was exclusive to MIMA physicians and was not made available to any other physician group.  The three MIMA physicians who participated in the program received half of the payment while MIMA itself received the other half of that annual stipend, such that all MIMA physicians benefited from it. Additionally, MIMA and its physicians billed for the services they provided to the patients who were referred by Palm Bay Hospital to them.

75.     Prior to that time, this service was provided on a volunteer basis, as it was a requirement of hospital medical staff membership, as set forth in the PBCH Medical Staff bylaws.

### 5. Health First Acted to Benefit MIMA's Radiation Therapy Facility to Induce MIMA Physicians to Refer Patients to Health First Facilities

76.     In 2002, Holmes Regional Medical Center (HRMC) and Health First initiated discussions with all cancer physicians in the community regarding the development of a community cancer center.  In 2003, Health First aborted these discussions, and MIMA opened its

own radiation therapy facility, the MIMA Cancer Center, at 1130A S. Hickory St., Melbourne, FL 32901.   Since these services were also being provided at Holmes Regional Medical Center, HFHP initially refused to reimburse MIMA physicians for treatment rendered to HFHP participants at MIMA's own radiation therapy facility, which at the time accounted for approximately 35% of patients being seen by MIMA physicians.

77.     Relator, who at the time volunteered as Chairman of the Neoplastic Disease Committee overseeing the Cancer Program at HRMC, learned through a conversation with Margaret Haney, former President of HFHP, that in 2003, MIMA came to an agreement with Health First to continue to admit patients exclusively to Health First hospitals and continue to participate exclusively with HFHP to the exclusion of all other Medicare Advantage Plans, in exchange for being reimbursed for radiation therapy provided to HFHP participants at MIMA's radiation facility.

78.     Shortly after this agreement between MIMA and Health First was reached, Holmes Regional Medical Center closed its 8,000 square foot hospital based radiation therapy facility which had at one point been treating as many as 100 patients per day and generating in excess of $10 million in profit for HRMC annually.   Upon the closing of the facility, HRMC radiation oncologists, staff and equipment were sold and/or transferred to MIMA.   This resulted in significant additional revenue for MIMA and its physicians, and further induced MIMA physicians to refer to Health First facilities.

**6.     Health First Provided Extra Services to MIMA Physicians Working at its Holmes Regional Medical Center to Induce Referrals to that Hospital**

79.     In approximately 2000, Holmes Regional Medical Center created a unique and exclusive benefit for MIMA and its physicians.   In exchange for MIMA's ongoing and continuing agreement to exclusively support Holmes Regional Medical Center and its affiliated

entities (including the HFHP, Health First Nursing, HF Hospice and Health First Laboratories), Holmes Regional Medical Center provided MIMA physicians the exclusive use of hospitalists to cover unreimbursed phone calls from hospital nursing staff and from MIMA outpatients during evenings and weekends. This program allowed MIMA doctors to avoid taking call and being woken up in the middle of the night for patient issues.

80.    In addition, Health First/Holmes Regional Medical Center provided hospital physicians (hospitalists) to admit MIMA patients to the hospital during evenings and weekends. At no time did MIMA reimburse HRMC or Health First for this service.   This service was not provided to any other physician groups or physicians who may have admitted patients to Holmes Regional Medical Center, but did not exclusively refer there. Relator made requests to Jerry Senne at HRMC for use of its hospitalists and to participate in the exact same program set up for the MIMA doctors, but was denied. At times, MIMA doctors would bill a consult charge for their initial visit or at times bill the admission charge, even though the admission orders were written by the Health First hospitalist.

81.    This program continued until the time that Health First acquired MIMA in February of 2013.  Those physicians who were employed by Health First and participated in this program by providing hospitalist services to MIMA physicians included Ron Sills, MD and approximately five other physicians. Initially this was the only service they provided as employees of Holmes Regional Medical Center.  Later they became part of a greater hospitalist program, but the main elements of the program did not change.

### 7.    Health First Provided MIMA and Other Physician Offices with Blood Products at No Charge to Induce Referrals

82.    Health First provided physician practices with millions of dollars of blood products annually without charge. Health First gave these blood products freely to physicians,

including Relator, in order to induce those physicians to refer patients to Health First hospitals. The free blood products were only provided to physicians who admitted patients to HRMC and other Health First hospitals. They were not provided to physicians who did not refer patients to HRMC. Dr. Richard Levine, and/or oncologists in his group practice, were physicians to whom HRMC would not provide blood products because they did not admit or refer patients to HRMC. The provision of blood products was overseen by numerous physicians including Dr. Carl Smedberg, the Director of the Holmes Regional Medical Center Blood Bank and the Chairman of Pathology at Holmes Regional Medical Center, and Steve Bunker, the president of HRMC, and successor hospital administrators.

83.     Health First and Holmes Regional Medical Center provided blood products to MIMA and other physicians practices for more than fifteen years (until approximately 2010) and did not charge those physicians or those physician practices for those blood products. The patients of these physician practices who ultimately received these blood products in therapeutic treatments from the physicians were neither inpatients nor outpatients at Holmes Regional. As a result, Health First thereby allowed physicians to bill for both the administration of the blood products and related treatments that utilized the blood products.

84.     Health First knew that this practice was illegal and violated the Anti-kickback Statute. Health First obtained the legal opinion of outside legal counsel Smith Hulsey and Busey regarding the legality of Health First and HRMC supplying blood products to private physicians without charge and widely distributed this legal opinion internally at Health First with permission to distribute it freely. This legal opinion specifically concluded that this arrangement violated the Anti-kickback statute, the Stark Law and Florida Statute § 395.0185 and § 458.33(1)(i). The opinion concluded that "HRMC needs to charge at least its cost associated

with the blood or blood products and then, only of the costs equal the fair market value of the product." In addition, this illegal practice was brought to the attention of hospital administrators including Jerry Senne, Chris Kennedy, former president of HRMC, and the hospital's compliance officer, Judith Fox.

85.     Patients 0001 through 0047 received treatments from Relator that included blood products that Relator received at no charge from Health First.

### 8.     Health First Provided Other Exclusive Benefits to MIMA Physicians

86.     HFHP allowed MIMA to use its own radiation therapy facilities and MRIs while it refused to reimburse other physicians and physician groups such as Omni for radiation therapy. Jerry Senne, of HRMC and Health First, said in a conversation with Relator that MIMA receives disparate and better treatment from Health First than Omni receives because MIMA had agreed to refer its patients exclusively to HRMC and Relator had not.

87.     From 2004 through 2013, HFHP would only contract with MIMA to perform cardiac catheterization laboratory services at its cardiac catheterization laboratory Atlantic Cardionet LLC. Health First retained an ownership interest in this laboratory along with MIMA. HFHP refused to contract with physicians outside of MIMA, including refusing to contract with Omni physicians, for cardiac catheterization laboratory services.

88.     HRMC is a Level II Trauma Center, which requires that the hospital have certain physician specialists on call at all times. In the event of facial trauma, HRMC was required to have on call at all times physicians with expertise in that area, including plastic surgeons, ENTs and maxillofacial surgeons. The on call physicians were paid for taking call. However, MIMA physicians, in order to induce them to refer patients, are placed on the call schedule disproportionately more often than other physicians who did not refer patients exclusively to HRMC. Further, Lance Grenevicki DMD, who did not refer patients to HRMC but instead

referred his patients to competitor Wuesthoff Hospital, was required to take call for no pay whatsoever, despite his repeated requests to be paid the same rate as his referring colleagues.

89.    Health First has appointed the following MIMA physicians as medical directors of the Health First hospital system, paying them exorbitant stipends for little or no work.

- Joe McClure, MD, PhD, Medical Director  Continuing Medical Education
- Tom Swain, MD, Medical, Director Cardiology, Quality Assurance
- Norberto Schectmann, MD, Medical Director Cardiology
- B.K. Dandapani, MD, Medical Director Stroke Program
- Enrique Polanco, MD, Medical Director Echocardiography
- Jim Schafer, MD, Medical Director Critical Care, Sleep Lab, Virtual Watch

In exchange, MIMA physicians are expected to, and do, refer patients exclusively to the HF hospital system.   These medical directorships were made exclusively available to MIMA physicians.

### 9.    Health First Acquired MIMA Far In Excess of Fair Market Value

90.    In February 2013, Health First acquired MIMA, paying an amount significantly in excess of fair market value.   The total price paid for the practice, including fixed assets, exceeded $178 million, plus loan forgiveness.  This was an exorbitant sum for a practice group than included approximately 100 physicians and represented a final reward for years of patient referrals and insurance that those physicians, once they became Health First physicians after the acquisition was consummated, would continue to refer patients to Health First facilities only.

91.    In September 2012, Health First engaged in negotiations to purchase Omni Healthcare, a specialty care practice in Melbourne with 16 physicians who did not refer exclusively to Health First, for only $3,837,308, for an average of $240,000 per physician which is far below the $1,780,000 per physician purchase price of MIMA.   This deal was never consummated.

92.     At the time of Health First's purchase of MIMA, Health First also purchased MIMA's ownership interest in MSDS. Marty Lenoci, on behalf of Osler Medical Group, wrote a letter to Health First protesting the fact that Health First was willing to pay $100,000 per MSDS limited partnership unit to MIMA, but refused to purchase the Osler units for this same amount. At the time of Health First's acquisition of MIMA and MSDS, Osler Medical Group physicians were employed by a competing health system, Wuesthoff Health System, which is owned by Health Management Associates, Inc. (NYSE: HMA).

93.     In September of 2011, Jerry Senne, then President of Holmes Regional Medical Center, wrote to Dr. Marty Lenoci, president of Physicians Development Group d/b/a Osler Medical Group, offering to purchase Osler Group's 10 limited partnership units in Doctor's Surgical Partnership, Ltd., owner of MSDS, for $27,000 per unit.  This was just 18 months prior to Health First agreeing to pay $100,000 per unit to MIMA for its ownership interest in MSDS.

94.     In September of 2011, Jerry Senne, who at the time was President of Holmes Regional Medical Center and Executive Vice-President for Strategy at Health First, wrote to Marty Lenoci, DPM, president of Physicians Development Group d/b/a Osler Medical Group which did not refer all of its patients to Health First, offering to purchase Osler Group's limited partnership units in Doctor's GI Partnership, Ltd., owner of The Melbourne GI Center, for $23,000 per unit.  This was just 18 months before Health First agreed to pay $50,000 per unit to MIMA for its ownership interest in The GI Center and before revenue at the Melbourne GI Center dropped by approximately 20% due to the loss of two physicians from Osler who had been referring to the center.

95.     In a May 16, 2013 email from Paul Miller, Director of Physician Office Operations at Health First Medical Group, titled "Competing Sales Reps", Mr. Miller stated

"Now that we are part of the Health First system we have several services that we previously did not have as MIMA, most notably physical therapy and hospice. It is the goal to drive business within the system…".

96.     To further ensure that these former MIMA physicians referred only to Health First after the acquisition, these MIMA physicians were told that if they do not sign with Health First, they would not be permitted to participate with HFHP.  And upon signing with Health First, Health First required MIMA physicians to terminate all contracts with other health insurance plans that allowed patients to be admitted to non-Health First hospitals. In essence, MIMA committed to refer exclusively to Health First hospitals by terminating their contractual relationships with Humana and United Healthcare Secure Horizons Medicare Advantage Plans, which allowed patients to be admitted to non-Health First hospitals.

**B.** **Health First Sells Geographic Exclusivity to Certain Physician Subspecialty Groups through Inflated Lease Arrangements, in violation of the Anti-Kickback Statute**

97.     Health First currently has an exclusive arrangement with A. Duda & Sons, Inc., the real estate company that owns and developed the real estate for Viera Hospital. The Second Amended and Restated Restrictions for Health First's Viera Medical Park restricts the surrounding medical office development as follows:

(1) Medical Office Restriction: All Viera/A. Duda and Sons land west of I-95 which is within 2.0 miles of the intersection of Wickham and Murrell Roads are prohibited from use as Medical Office Space EXCEPT - medical office space in any single medical office building or, if developed by a single developer or as a single project, in any medical office complex with multiple buildings containing less than 10,000 aggregate square feet of medical office space and Medical Office Space in any general office building, shopping center or mixed use commercial building with less than 30% of rentable space used as medical office space. Assuming that Health First completes 70% of the 160,000 Phase I square footage by November 30, 2007, then the medical office restriction extends until November 30, 2008.

(2)The Cancer Center, Fitness Center, The Ambulatory Surgery Center Restriction and Diagnostic Center (including but not limited to - radiology, MRI, CT, PET, nuclear medicine, mammography, and ultrasound) Restrictions - all Viera/Duda land west of I-95 and within 2.5 miles of the intersection of Wickham and Lake Andrew is prohibited from use as an Ambulatory Surgery Center or Diagnostic Center through November 30, 2009 so long as Health First substantially completes 70% or more of the Phase I maximum square footage (160,000 s.f.) not later than November 30, 2007. Provided that Health First completes not less than 70% of the maximum square footage for Phase II (100,000) on or before November 30, 2009, the restriction for both uses will be extended until November 30, 2011.

Thus, Health First retained the exclusive right to control all medical provider services in the geographic area surrounding Viera Medical Park.  In order for any medical practitioner to gain access to patients in this area, he or she had to do business with and through Health First.

98.    Health First leased office space in Viera to specialty physician groups at exorbitant lease rates in exchange for Health First granting those groups exclusivity to be the sole provider of that specialty in and around Viera. Such specialty physician groups that were given this exclusivity in exchange for paying above market lease payments for vacant space include Space Coast Cancer Center and Greenspoon Orthopedics.  For example, Space Coast Center signed an obviously exorbitant lease for 20,000 square feet at $30 per square foot for 10 years. Essentially, those groups were paying for referrals to their practice from Health First and paying to exclude other groups from receiving such referrals.  Health First was receiving from those specialty physician groups payments in the form of above market rents in exchange for making those referrals.

**C.    Health First and MIMA, as Owners of Medical Facilities, Each Engaged in Self-Referrals in Violation of The Stark Law**

**1.    HFHP Refers its Plan Participants Exclusively to MSDS, which Health First Partially Owns**

99.    Allowing MIMA physicians to purchase an ownership stake in MSDS was designed to and in fact operated to induce those physicians to refer patients to MSDS and insure

28

its profits, which financially benefitted both those doctors and Health First as owners of the facility.  Health First also allowed other physicians, including those of the Osler Medical Group, to purchase an ownership stake in MSDS.  These were physicians who operated at MSDS, or were capable or agreed to refer patients to MSDS. In addition to the returns it receives based on its ownership stake in MSDS, Health First receives a management fee from MSDS which is based on the percentage of MSDS' gross revenues.

100.    From 1999 to the present, HFHP contracted with MSDS to refer HFHP enrollees exclusively to MSDS for outpatient surgery services while refusing to contract with any other outpatient surgery facility in the area. In a letter dated March 9, 2006, from Margaret Haney, President and Chief Operating Officer of HFHP to Brian Ulery of Omni Healthcare, Ms. Haney stated:

> I have received your letter of February 21, 2006 requesting that I reconsider our decision not to contract with Sheridan Surgery Center.  As I have discussed with OMNI representatives on numerous occasions, Health First's current contract with Melbourne Same Day Surgery Center prohibits such an agreement."

101.    As a result, HFHP plan participants, including those with managed Medicare, could only go to MSDS and no other surgery center for an outpatient surgical procedure, in violation, *inter alia*, of 42 U.S.C. § 1395a.[3]  Such referrals by HFHP to MSDS violated the prohibition on such arrangements set forth in The Stark Law.

**2.      MIMA Refers its Patients Exclusively to MSDS, which it Partially Owns**

102.    Allowing MIMA physicians to purchase an ownership stake in, and have a financial relationship with, MSDS was designed to and in fact operated to induce those

---

[3] 42 U.S.C. § 1395a. Free choice by patient guaranteed
(a) Basic freedom of choice
Any individual entitled to insurance benefits under this subchapter may obtain health services from any institution, agency, or person qualified to participate under this subchapter if such institution, agency, or person undertakes to provide him such services.

physicians to refer patients to MSDS and insure its profits, which financially benefitted both MIMA and its doctors. Thus, such referrals by MIMA physicians to MSDS violated the prohibition on such arrangements set forth in The Stark Law.

### 3. HFHP Refers its Plan Participants Exclusively to Melbourne GI Center, which it Partially Owns

103. Health First allocated 40% of ownership of Doctors GI Partnership Ltd., the corporate entity that owns The Melbourne GI Center, to MIMA, 10% to Osler and retained the remaining 50%. Health First also manages the facility. HFHP has required that all HFHP plan beneficiaries have all GI procedures performed at The Melbourne GI Center, refusing to contract with any other competing facility. This increased the revenues of HFHP as equity owners and of its parent, Health First. HFHP's referral of its plan beneficiaries exclusively to The Melbourne GI Center violated the prohibition on such arrangements set forth in The Stark Law.

### 4. MIMA Refers its Patients Exclusively to Melbourne GI Center, which it Partially Owns

104. Health First allocated 40% of ownership of Doctors GI Partnership Ltd., the corporate entity that owned The Melbourne GI Center, to MIMA physicians in order to induce them to make referrals to the GI Center. This arrangement has since generated millions of dollars to MIMA and its physicians through its ownership stake in the GI Center. Such referrals by MIMA physicians to The Melbourne GI Center violated the prohibition on such arrangements set forth in The Stark Law.

### D. Health First Knowingly Directly Presented False Claims to the Government

### 1. Health First Forced its Hospital Inpatients to Get PET Scans at Health First Outpatient Facilities so it Could Bill Separately for those Scans

105. Under the diagnosis related group (DRG) reimbursement program, healthcare facilities receive a lump sum payment from CMS in contemplation of broad treatment and

testing.  DRG payments are based on fixed prices that are established in advance for hospital services based on patient diagnosis.  DRG payments are paid regardless of the actual costs hospitals incur in providing these services.  Hospitals are allowed to retain the difference between their costs and the fixed DRG prices, in order to incentivize them to become efficient managers of resources.

106.    Physicians who need to visualize three dimensional models of their patient's anatomy can order a positron emission tomography (PET) scan. This diagnostic tool is often used on cancer patients to observe or track cancer growth.  On January 23, 2001, Health First began utilizing PET scans for its patients by installing a PET scanner at Holmes Regional Hospital.  The DRG payment as computed by CMS has an imputed cost for PET scans, such that hospitals are not paid any additional amounts for PET scans performed on inpatients. Soon after implementing its PET scanner in Holmes Regional, Health First realized that even though it received the DRG payment for patients which required PET scans, the best way to make money was to flip the patients temporarily to outpatient status, conduct and bill the test separately, then flip the patient back to inpatient status.  In this way they could accept the DRG payment (which contemplates diagnostic testing like PET scans) as well as bill separately for the test itself.

107.    Health First implemented a policy of denying and refusing to schedule PET scans ordered by physicians for inpatients at Health First facilities, and requiring those inpatients to be discharged and then to have these studies performed as an outpatient.  This allowed Health First to avoid covering the cost of the PET scan out of the DRG payment it received for that patient and to bill government healthcare programs in excess of an additional $2,000 per scan, from 2003 to the present.

108.   In an email dated July 3, 2003 from Chris K. Finton, MD, Vice President of Medical Affairs for Health First and Executive Director of the Health First Heart Institute, to HRMC Medical Staff titled "Inpatient PET Scans", Dr. Finton stated that that "HRMC pays the PET company on a per case basis plus the cost of the radiopharmaceutical but receives no additional reimbursement to offset the cost.   On an annual basis, this is a substantial cost. Effective July 7, 2003, HRMC will no longer be able to provide PET scanning for inpatients."

109.   Relator immediately complained of this decision in a letter dated August, 2003 to Judith Fox, Director of Corporate Compliance for Health First, and again in a letter to her dated August 24, 2003 in which Relator wrote, "It is my understanding that hospitals are required to perform medically necessary studies ordered by a physician when these services are available. To require that patients be discharged from the hospital so that they can have the tests performed on an outpatient basis to reduce the hospital's costs and increase their profits for services performed outside of the DRG would potentially constitute Medicare fraud."

110.   This illegal policy continues to this day.   In July 2013, Patient # 1001, an 85 year old woman, was admitted to Viera Hospital with a lung mass.   She should have had a PET scan performed as an inpatient for a solitary pulmonary nodule.   Instead, she was discharged and the study was performed as an outpatient.

111.   Patients 1001 through 1007 are examples of government insured Health First inpatients who were prescribed PET scans but who were discharged from a Health First hospital to obtain the prescribed PET scan as an outpatient.   Upon information and belief, these PET scans were billed to, and paid by, government insurance programs.

### 2. HF Hospice Discharged Hospice Patients to be Treated at Health First Hospitals on a Fee for Service Basis under Medicare Part B

112. Health First owns the HF Hospice in addition to its four hospitals. Relator served as a medical director for the HF Hospice in 1999.

113. Upon election of the hospice benefit, the hospice provider assumes the financial responsibility for all medical care related to the beneficiary's terminal illness and related conditions and in return, receives from Medicare a daily capitated payment to cover the costs of all such services. The beneficiary waives Medicare coverage for treatment of the terminal condition or a related condition but retains Medicare coverage for services to treat conditions unrelated to the terminal illness.

114. HF Hospice patients who required in-hospital care, treatment or procedures would routinely be temporally dis-enrolled from the HF Hospice and admitted to a Health First hospital where Medicare would be billed on a fee for service basis for treatment related to the terminal condition. This would allow the HF Hospice to avoid having to deduct the cost of the inpatient care, treatment or procedure from the Medicare capitated payment. Upon discharge from the Health First hospital, the patient would be re-enrolled in HF Hospice. Patients 1101 through 1177 are examples of this.

115. Additionally, HF Hospice patients who required high cost palliative outpatient care (i.e. radiation or palliative chemotherapy) would routinely be temporally dis-enrolled from the HF Hospice so that the services would be billed to Medicare Part B on a fee for service basis. This would allow the HF Hospice to avoid having to deduct the cost of this service from its capitated payment. Upon completion of the treatment, the patient would then be re-enrolled in hospice. In addition to violating the federal and Florida False Claims Acts, this was also a

violation of Medicare rules for the hospice industry as defined in the Federal Register Vol. 64.

No. 192 October 5, 1999 pp. 54031-54049.

### 3. Health First Required Patients to Receive Blood Transfusions as Inpatients, a Practice Known as Flipping

116.    After Health First ceased supplying referring physicians with blood products at no cost in early 2008, Health First then began charging physicians for the purchase of blood products.  The amounts Health First charged were more than twice the amount of Medicare's allowable as determined by Medicare/CMS (which Health First knew because it itself had billed Medicare for blood products).  For example, Health First charged Omni $745 for a blood product for which TRICARE reimbursed Omni $50, and Health First charged Omni $338 for a P9053 service for which TRICARE reimbursed Omni $100.  Omni Healthcare, as a practice, expended more than $100,000 for the purchase of blood products in a relatively short period of time, and ultimately stopped all purchases of blood products from Health First.

117.    As a result of Health First's exorbitant rates for blood products, physicians were economically disincentivized from themselves providing blood products and related treatments and services to their patients.  At the same time, Health First closed the HRMC Outpatient Infusion Center at HRMC. Health First did open an outpatient transfusion facility in Palm Bay, but it was a part time, converted outpatient pain management facility that was open only 3 days a week for a half day each and was 25 miles south, out of the patient geographic region. It was also not staffed by doctors trained in administering blood products and related treatments. This left only one alternative – referring patients to Health First hospitals for transfusions.

118.    Health First's action - to charge exorbitant rates for blood products, close the HRMC Outpatient Infusion Center and thereby prevent outpatient admissions for blood products, open an outpatient facility at Palm Bay that was 25 miles away and only periodically available to

treat patients and for the most part rarely staffed – was designed to and ultimately did result in patients having to be admitted as inpatients to a Health First hospital for blood transfusions.  The administration of blood products is normally an outpatient procedure which can be performed in an infusion center or an outpatient center of a hospital.

119.   On November 7, 2007, John McPherson, Chief Medical Officer of HRMC, sent a letter to area physicians outlining Health First's decision to close its HRMC outpatient infusion center on December 31, 2007 and cease providing blood products at no cost outside of the hospital effective January 1, 2008.  On December 3, 2007, Relator sent a letter to Dr. McPherson expressing his concerns that the simultaneous closing of the outpatient transfusion center, coupled with the change in policy to no longer provide blood products outside of the hospital, would result in increased and unnecessary admissions to Health First hospitals patients for blood transfusions.  On January 10, 2008, Relator sent a letter to Dr. John McKinney, President of the HRMC Medical Staff, expressing the same concerns.   There was a list of Medicaid and Medicare patients who, in fact, were required to be referred to HRMC for the administration of blood products by Drs. Duhaime, Pichardo, Badolato and Deligdish of Omni Healthcare.

120.   Many physicians were involved in multiple healthcare community wide discussions concerning how ceasing to supply blood and closing the infusion center would result in unnecessary and wasteful hospital admissions.  These discussions included representatives of the Medical Executive Committee, the hospital's president, Dr. John McKinney, Mr. Senne, Dr. McPherson, Judy Killebrew, and Drs. Badolato, Barile, Catena, Duhaime, Graff, Hoang, Htay, McClure, Neel, Pichardo, Scheinbart, Seelman, Vinarsky, Yandel and Singh.

121.   On January 22, 2008, following the closing of the HRMC outpatient transfusion facility, Health First sent a memo to area physicians that outlined two options for providers.

Option 1 was to enter into a contract with Health First to provide blood products to the physician office at a contracted rate that was actually greater than what CMS would reimburse, and thus cause providers to lose money. Option 2 was to refer patients to Health First's new outpatient transfusion facility in Palm Bay. Palm Bay was a part time, converted outpatient pain management facility open only 3 days a week for a half day each and was 25 miles south, out of the patient geographic region. It was also not staffed by doctors trained in administering blood products and related treatments. In essence, as the only viable option for blood products, Health First forced all Melbourne patients to its local Melbourne inpatient facilities, including HRMC, where they could charge additional fees to administer the blood. Health First's tactics resulted in government insured patients being charged more for blood and/or the administration of blood products than they otherwise would have been charged.

122.    On January 28, 2008, the Medical Executive Committee of HRMC met and discussed issues relating to blood products.  On January 31, 2008, Jerry Senne of Health First sent a memo to Rick Hynes following up on the aforementioned meeting.  The memo references three issues related to blood products: flexibility in choosing an option to either purchase the blood products or refer patients "to the Pain Center on Babcock Street" (Palm Bay); Medicare and legal restrictions on billing; and the price of blood products relative to the cost of procurement from the Central Florida Blood Bank.

123.    On February 15, 2008, Judy Killebrew, the Chief Operating Officer of Health First, sent a letter to the heads of the three largest physician practice groups in Brevard County; Omni, Osler, and MIMA.  The letter confirmed three options for these practices with regard to blood products.  Option 1 was to enter into a contract with Health First to provide blood

products. Option 2 was to simply refer patients to Palm Bay for blood products. Option three was to choose both options 1 and 2.

124.    On February 22, 2008, Joe Wasselle sent an email to HRMC Board member Cathy Ford expressing concern about Health First's decision to close the HRMC infusion center while at the same time opening a for-profit outpatient infusion facility at Palm Bay that, unlike the HRMC infusion center, would not be required to accept indigent patients. This memo correctly predicted that physicians would be forced to refer patients to Health First's Palm Bay facility or lose money in their practice on the purchase of blood products for government insured patients.

125.    Since 2008, any patients for infusions or blood products, such as Patient 1201, should have been billed as an outpatient, but were required to be admitted to the hospital as full admissions. On March 19, 2008, Relator sent a letter to Health First's Chief Quality Officer, James Palermo, complaining about the treatment of Patient 1201 who had to be admitted via the emergency room due to the policy changes.

**E.    Health First Failed to Maintain the Required Quality Assessment & Performance Program and Failed to Adequately Track and Report Adverse Patient Events**

126.    Holmes Regional Medical Center, the Health First Health Plan and Health First of Melbourne, Florida, violate state and federal law, including its conditions of participation in the Medicare program (*see* 42 C.F.R. §§ 482.11 and 482.21), by concealing, failing to report, failing to incorporate into and maintain an adequate Quality Assessment & Performance Program and failing to make available to surveyors data concerning numerous incidents of serious adverse patient events. By doing so, Holmes Regional Medical Center and Health First not only perpetuate an inadequate, even dangerous level of patient care and wrongfully bill federal health

care programs for a level of care that fails to meet federal and state standards. Patients 1202 through 1208 are examples of this.

127.   Health First hospitals were rife with serious patient safety issues, including:

- Beginning in 2003, it became apparent that nurses were keeping two sets of vital signs for patients at Holmes Regional Medical Center, one set which was placed into the computerized medical record system, and another set which was being maintained on clipboards outside of patient rooms.

- Beginning in 2003, there were numerous quality issues within the Holmes Regional Medical Center Radiology Department which resulted from the hospital's decision to directly employ radiologists.

- For more than ten years, Holmes Regional Medical Center failed to provide critical laboratory studies to include microbiology culture results to physicians following the discharge of patients from the hospital.

- For five years, the Health First Health Plan maintained a policy of capitating its physician specialists and this policy resulted in inadequate access to specialty medical care.

- For more than ten years the staff at Holmes Regional Medical Center failed to consistently file adverse events reports, despite direct written orders in the medical record from physicians to do so.

- In 2009, the medical staff identified a number of quality issues with several general surgeons on the medical staff which led the Medical Executive Committee at Holmes Regional Medical Center, to suspend these physicians pending an investigation. HRMC failed to report one such physician to the National Practitioner Data Bank, in violation of Federal laws that require that a report be filed.

- In 2005, Patient 1209 was treated at Holmes Regional Medical Center and received an overdose of ifosfamide which ultimately lead to her death, which was not reported to the Agency for Health Care Administration (AHCA) of the State of Florida as was required by law.

- Numerous problems related to the cardiac surgical service at HRMC, including medication administration errors, improper usage of external electrical pacing device, failure by nursing to report significant patient clinical changes, failure to properly manage chest drainage tubes, staff inability to assist with emergency procedures including emergency sternal entry and internal defibrillation, inability to effectively assemble medical emergency equipment and suction devices, and failure to follow written electrolyte replacement protocols. Furthermore, in 2010 there were two unexpected deaths following cardiac surgical procedures due to medical error.

## VI.   COUNTS

### Count I
### Federal False Claims Act
### 31 U.S.C. §§ 3729(a)(1)(A),
### and (a)(1)(B)
### Against All Defendants
### For Unlawful Kickbacks

128.    Relator alleges and incorporates by reference paragraphs 1 through 127 of this Complaint as if fully set forth herein.

129.    Relator seeks relief against Defendants under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B).

130.    Through the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

131.    Through the acts described above, Defendants knowingly made, used, or caused to be made or used false or fraudulent records and statements, material to a false or fraudulent claim to the United States for payment or approval.

132.    The United States Government and its officers, employees and agents, unaware of the falsity of the records, statements, and claims made or caused to be made by the Defendants, paid and continue to pay claims that would not be paid but for the Defendants' illegal and fraudulent practices.

133.    By reason of the acts of Defendants, the United States has been damaged, and continues to be damaged, and therefore is entitled to multiple treble damages under the False Claims Act in an amount to be determined at trial, plus a civil per claim penalty in the maximum amount permitted by law for each violation.

## Count II
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(C)
### Against All Defendants for Conspiracy

134.   Relator alleges and incorporates by reference paragraphs 1 through 133 of this Complaint as if fully set forth herein.

135.   Relator seeks relief against all Defendants under the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

136.   Through the acts described above, Defendants, acting in concert, conspired to knowingly present or cause to be presented, false or fraudulent claims to the United States for payment or approval.

137.   The United States Government and its officers, employees and agents, unaware of the falsity of the records, statements, and claims made or caused to be made by the Defendants, paid and continue to pay claims that would not be paid but for the Defendants' illegal and fraudulent practices.

138.   By reason of the acts of Defendants, the United States has been damaged, and continues to be damaged, and therefore is entitled to multiple treble damages under the False Claims Act in an amount to be determined at trial, plus a civil per claim penalty in the maximum amount permitted by law for each violation.

## Count III
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(A) based on violations of the
### The Stark Act, 42 U.S.C. § 1395nn
### Against All Defendants

139.   Relator alleges and incorporates by reference paragraphs 1 through 127 of this Complaint as if fully set forth herein.

140.    Relator seeks relief against all Defendants under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

141.    Defendants knowingly and willfully engaged in illegal financial arrangements, including unlawful compensation and referral practices, and violated the Stark Act.

142.    Subsequently, the Defendants submitted or caused to be submitted claims for payments to Medicare and Florida Medicaid programs.  Each of these claims – which were paid in whole or in part with federal funds – was accompanied by an express or implied certification that the underlying transaction was not in violation of federal and state statutes, regulations, or program rules, including the Stark Act.  Each of those certifications by the Defendants were false, because each claim for payment was tainted by the violations of the laws, rules and regulations described in this Complaint.  Accordingly, Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States in violation of 31 U.S.C. § 3729(a)(1)(A).

143.    By reason of Defendants' false and fraudulent claims, the United States has been damaged, and continues to be damaged, and therefore is entitled to multiple, treble damages under the False Claims Act in an amount to be determined at trial, plus a civil per claim penalty in the maximum amount permitted by law for each violation.

**Count IV**
**Florida False Claims Act**
**Fla. Stat. § 68.082(2)(a), (b)**
**Against All Defendants**
**For Unlawful Kickbacks**

144.    Relator alleges and incorporates by reference paragraphs 1 through 127 of this Complaint as if fully set forth herein.

145.    Relator seeks relief against Defendants under the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*

146.    Through the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent Medicaid claims to Florida for payment or approval.

147.    Through the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to get false or fraudulent Medicaid claims allowed or paid by Florida.

148.    As a result, Florida State monies were lost through the payment of such false and fraudulent claims.

149.    The State of Florida has been damaged, and continues to be damaged, in an amount to be determined at trial, because of the acts of Defendants.

### Count V
**Florida False Claims Act**
**Fla. Stat. § 68.082(2)(a) and (b) based on violations of the**
**The Stark Act, 42 U.S.C. § 1395nn**
**Against All Defendants**

150.    Relator alleges and incorporates by reference paragraphs 1 through 127 of this Complaint as if fully set forth herein.

151.    Relator seeks relief against all Defendants under the Florida False Claims Act, Fla. Stat. § 68.082(2)(a) and (b).

152.    Defendants knowingly and willfully engaged in illegal financial arrangements, including unlawful compensation and referral practices, and violated the Stark Act.

153.    Subsequently, Defendants submitted or caused to be submitted claims for payments to the Florida Medicaid programs.  Each of these claims was accompanied by an express or implied certification that the underlying transaction was not in violation of state or

42

federal statutes, regulations, or program rules, including the Stark Act. Each of those certifications by the Defendants were false, because each claim for payment was tainted by the violations of the laws, rules and regulations described in this Complaint. Accordingly, Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States in violation of the Florida False Claims Act, Fla. Stat. § 68.082(2)(a) and (b).

154.    By reason of Defendants' false and fraudulent claims, the State of Florida has been damaged, continues to be damaged, and therefore is entitled to multiple, treble damages under the Florida False Claims Act in an amount to be determined at trial, plus a civil per claim penalty in the maximum amount permitted by law for each violation.

**Count VI**
**Florida False Claims Act**
**Fla. Stat. § 68.082(2)(c)**
**Against All Defendants**

155.    Relator alleges and incorporates by reference paragraphs 1 through 127 and 150 through 154 of this Complaint as if fully set forth herein.

156.    Relator seeks relief against Defendants under the Florida False Claims Act, Fla. Stat. § 68.082(2)(c).

157.    Through the acts described above, Defendants, acting in concert, conspired to knowingly present or cause to be presented, false or fraudulent claims to the United States for payment or approval.

158.    As a result, Florida State monies were lost through the payment of such false and fraudulent claims.

159.    The State of Florida has been damaged, and continues to be damaged, in an amount to be determined at trial, because of the acts of Defendants.

## PRAYER

**WHEREFORE,** Relator prays for judgment against the Defendants as follows:

160.    That Defendants cease and desist from violating *31 U.S.C. § 3729, et seq., and Fla. Stat. § 68.081 et seq.*;

161.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, *et seq;*

162.    That this Court enter judgment against Defendants in amount equal to three times the amount of damages the State of Florida has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of Fla. Stat. § 68.082(2);

163.    That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act, and § 68.085 of the Florida False Claims Act;

164.    That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

165.    That Relator recover such other relief as the Court deems just and proper.

## CERTIFICATE OF SERVICE

I, Jill S. Schwartz, hereby certify that the Complaint pursuant to the Federal False Claims Act, 31 U.S.C. §§ 3729 Et Seq. and Pendent State False Claims Act was filed on March 27, 2014 with the Clerk of Court and sent to the following parties by certified mail, return receipt requested:

Eric E. Holder, Jr.
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, D.C. 20530-0001

A. Lee Bentley, III
United States Attorney
Middle District of Florida
400 North Tampa Street, Suite 3200
Tampa, Florida 33602

Pam Bondi
Attorney General
Office of the Attorney General
The Capitol PL-01
Tallahassee, FL 32399-1050

Jeff Atwater
Chief Financial Officer
Florida Department of Financial Services
200 East Gaines Street
Tallahassee, FL 32399-0300

Katherine Ho
Assistant U. S. Attorney
U.S. Attorney's Office
400 W. Washington Street, Suite 300
Orlando, FL 32801

Jill S. Schwartz

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a

trial by jury.

Dated:  March 27, 2014        **JILL S. SCHWARTZ & ASSOCIATES, P.A.**

Jill S. Schwartz, Attorney at Law
Florida Bar No. 523021
K. Mollie Smith, Attorney at Law
Florida Bar No. 0085419
655 W. Morse Boulevard, Suite 212
Winter Park, FL 32789-3745
Telephone: (407) 647-8911
Facsimile: (407) 628-4994
jschwartz@schwartzlawfirm.net
msmith@schwartzlawfirm.net


**BERGER & MONTAGUE, P.C.**
Russell D. Paul
(PA Bar No. 71220; DE Bar No. 4647)
Daniel R. Miller
(PA Bar No. 68141; DE Bar No. 3169)
1622 Locust Street
Philadelphia, PA  19103-6305
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
rpaul@bm.net
dmiller@bm.net

Kal6492325

45