**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

UNITED STATES OF AMERICA,
THE STATE OF FLORIDA,
EX REL. JOHN DOE,

               Plaintiffs,

                                        **Case No.:**
vs.                                  **6:14cv501-ORL-37DAB**

HEALTH FIRST, INC., HEALTH FIRST        **DISPOSITIVE MOTION**
HEALTH PLANS, INC., HEALTH FIRST
MEDICAL GROUP, MELBOURNE INTERNAL
MEDICAL ASSOCIATES, P.A., HOLMES REGIONAL
MEDICAL CENTER, PALM BAY HOSPITAL,
CAPE CANAVERAL HOSPITAL, AND
VIERA HOSPITAL,

               Defendants.
_____/

### DEFENDANTS' JOINT MOTION TO DISMISS COMPLAINT
### and INCORPORATED MEMORANDUM OF LAW

       Defendants, Health First, Inc., Health First Health Plans, Inc., Health First Medical Group,

Holmes Regional Medical Center, Palm Bay Hospital, Cape Canaveral Hospital, Viera Hospital

and Melbourne Internal Medical Associates, P.A. (collectively the "Defendants"),[1] pursuant to

Federal Rules of Civil Procedure 12(b)(1), 12(b)(6) and 9(b) and Local Rule 3.01, hereby jointly

move to dismiss all claims against the Defendants asserted by Relator (Doc. No. 1).[2]  In support,

---

[1] The Defendants include all named defendants.  Health First, Inc. will be referred to as "Health First," Health First Health Plan, Inc. will be referred to as "HFHP," Holmes Regional Medical Center will be referred to as "HRMC," and Melbourne Internal Medical Associates, P.A. will be referred to as "MIMA."  MIMA is represented by separate counsel who joins in this consolidated Motion to Dismiss and Incorporated Memorandum of Law.

[2] Relator filed this *qui tam* action as a "John Doe" relator under seal on March 27, 2014, after which both the United States and the State of Florida declined to intervene.  Relator's counsel has confirmed that Dr. Craig Deligdish is the Relator in this case.  (Doc. Nos. 21 and 31.)  Dr. Deligdish has also sued Health First and related entities in a separate

the Defendants state as follows:

## I.     INTRODUCTION

In shotgun fashion, this *qui tam* Complaint alleges violations of the federal False Claims Act (the "FCA") and its Florida counterpart[3] predicated on more than two dozen disparate activities, dating from 1999 to early 2013, that were purportedly unlawful under a variety of statutes and regulations.  Six counts incorporating all of these allegations are asserted against the eight "Defendants" collectively, without any effort to distinguish *which* "false claims" were submitted *when* and by *which* Defendants in violation of *which* laws.  Nor does the Complaint provide sufficient support to explain how the Relator, who has never been employed by any of the Defendants, can reliably support allegations about the variety of false claims based on numerous activities by numerous entities over a period of 14 years.  Nonetheless, the Relator alleges that more than $100 million annually in false claims to the government were made by "Defendants" between 1999 and February 2013.

Dismissal of the Complaint is required for numerous reasons.  First, many of the claims are barred by the FCA's six-year statute of limitations.  Second, because many of the claims are based on information that has already been publicly disclosed by other sources, much of the Complaint is due to be dismissed under the FCA's public disclosure bar pursuant to Rule 12(b)(1) or 12(b)(6).  Third, pursuant to Rule 9(b), Relator's allegations fail to meet this Circuit's well-settled standards for alleging with particularity the "who," "what," "when," and "where" of purportedly false claims and of the underlying circumstances which allegedly rendered them false.

action before this Court.  *See OMNI Healthcare, Inc., Craig Deligdish, et al. v. Health First, et al.*, Case No. 6:13-cv-1509-ORL-37DAB.

[3] 31 U.S.C. § 3729 *et seq.*, and § 68.081, Fla. Stat., *et seq.*  The Florida FCA is generally interpreted under the same standards as the federal FCA.  *See United States v. All Children's Health Sys., Inc.*, No. 8:11–cv–1687–T–27EAJ, 2013 WL 1651811, at *2 (M.D. Fla. Apr. 16, 2013).  The laws will be referred to as the "federal FCA" or "Florida FCA" to the extent that any distinctions between them are material.

Finally, Relator also fails under Rule 12(b)(6) to state a claim on which relief can be granted because there are no adequate allegations of specific claims, much less allegations of specific false claims presented to the government.  The Relator's failure to state a claim under Rule 12(b)(6) also includes his failure to allege sufficient facts to state a claim for violation of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b ("AKS"), the federal Stark Act, 42 U.S.C. § 1395nn, or any other law underlying the purportedly "false" certifications accompanying any "false claims." For all of these reasons, the Complaint must be dismissed in its entirety.

## II.   LEGAL STANDARDS

"To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts to state a claim that is 'plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007)).  In addition, claims asserted under the FCA are subject to the stricter pleading standards of Federal Rule of Civil Procedure 9(b).  *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1308–09 (11th Cir. 2002).  An FCA complaint "satisfies Rule 9(b) if it sets forth facts as to *time*, *place*, and *substance* of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, *when they occurred*, and *who engaged in them*." *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009) (quotation omitted) (emphasis added).

In addition, "[c]ourts may take judicial notice of publicly filed documents, such as those in state court litigation, at the Rule 12(b)(6) stage" to assess the applicability of the FCA's public disclosure bar.  *United States ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811-12 & n.4 (11th Cir. 2015).  This is also true for jurisdictional challenges under Rule 12(b)(1). *See Makro Capital*

*of Am., Inc. v. UBS AG*, 543 F.3d 1254, 1258 (11th Cir. 2008) (allowing use of extrinsic evidence to assess evidence under Rule 12(b)(1) challenge).

## III.   ARGUMENT

### A.   The FCA's Six-Year Statute of Limitations Bars Much of the Complaint.

Under both the federal and Florida FCA, the statute of limitations runs for six years after the date on which a violation is committed.  31 U.S.C. § 3731(b); § 68.089, Fla. Stat.  A person commits an FCA violation, for example, when that person submits a false or fraudulent claim for payment to the government, at which point the statute of limitations would commence.  *United States v. Entin*, 750 F. Supp. 512, 517 (S.D. Fla. 1990) (citing *Smith v. United States*, 287 F.2d 299, 304 (5th Cir. 1961)); 31 U.S.C. § 3729(a)(1)(A).

On March 27, 2014, Relator filed the *qui tam* Complaint.  (Doc. No. 1.)  Accordingly, the FCA's statute of limitations precludes recovery based on any claims for payment submitted to the government by the Defendants prior to March 27, 2008.  Moreover, as the Complaint itself makes clear, much of the alleged wrongful conduct predates March 27, 2008.  For example:

- Complaint § A.1.a (¶¶ 49-58) references dates entirely prior to March 27, 2008.

- Complaint § A.1.b (¶ 59) references dates going back to 2000.

- Complaint § A.2 (¶¶ 62-67) references dates going back to 2002.

- Complaint § A.4 (¶¶ 74-75) references dates entirely prior to March 27, 2008.

- Complaint § A.5 (¶¶ 76-78) references dates entirely prior to March 27, 2008.

- Complaint § A.6 (¶¶ 79-81) references dates going back to 2000.

- Complaint § A.7 (¶¶ 82-85) references a date of "approximately 2010," but subsequent more specific allegations in the Complaint (¶¶ 116, 119, 125) make

clear that the practice at issue ceased on "January 1, 2008," and is therefore entirely prior to March 27, 2008.

- Complaint § A.8 (¶¶ 86-89) references dates going back to 2004.

- Complaint § B (¶¶ 97-98) references a contract entered before November 30, 2007.[4]

- Complaint § C.1 (¶¶ 99-101) references dates going back to 1999 and a letter from 2006.

- Complaint § C.2 (¶ 102) provides no dates, but describes the same conduct from § A.1.a (¶¶ 49-58), which referenced dates prior to March 27, 2008.

- Complaint § C.3 (¶ 103) provides no dates, but describes the same conduct from § A.2 (¶¶ 62-67), which referenced dates going back to 2002.

- Complaint § C.4 (¶ 104) provides no dates, but describes the same conduct from § A.2 (¶¶ 62-67), which referenced dates going back to 2002.

- Complaint § D.1 (¶¶ 105-111) references dates going back to 2001.

- Complaint § D.2 (¶¶ 112-115) provides no dates other than 1999.

- Complaint § E (¶¶ 126-127) references dates going back to 2003.

Without more specificity as to dates, these claims should be deemed to be time-barred.

As noted above, many of the allegations are not dated at all and others reference a specific date outside the statute of limitations as part of an allegedly continuing practice.  But even if these allegations are deemed to span the entirety of Relator's fourteen-year timeframe (1999-2013), every cause of action based upon them must be greatly truncated by the statute of limitations. Relator should be required to specify the who, what and when of each false claim he alleges was

---

[4] The Complaint's quotation of the subject contract makes clear that it was entered before November 30, 2007 by stating that "[a]ssuming that Health First completes 70% of the 160,000 Phase I square footage by November 30, 2007…."

submitted by Defendants. *United States ex rel. Joshi,* 441 F.3d 552, 558 (8th Cir. 2006) (affirming dismissal where "the specific instances of fraud cited by Dr. Joshi all occurred in November 1995 and Dr. Joshi failed to tie the allegations into a continuous pattern of conduct by [defendants], the six-year statute of limitations barred the additional claims"); *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 875, 878 (6th Cir. 2005) (affirming dismissal of claims where there was no sufficient allegation of conduct within the limitations period).

**B.      The FCA's "Public Disclosure" Bar Applies to Much of the Complaint.**

"The purpose of the FCA is to encourage private citizens to expose fraud against the government, while preventing opportunistic suits by individuals who hear of fraud through public sources but played no part in exposing it." *Klusmeier v. Bell Constructors, Inc.*, 469 Fed. App'x 718, 720 (11th Cir. 2012). Therefore, the FCA laws incorporate "public disclosure" bars which prevent relators from profiting from instituting *qui tam* actions on the basis of information already in the public unless the relator was the "original source" of such information.

**1.      Amendments to the federal and Florida FCA provide for different applications of the "public disclosure bar" to different periods of the Relator's allegations between 1999 to 2013.**

In 2010, Congress passed the Patient Protection and Affordable Care Act ("PPACA"), Pub. L. No. 111–148, 124 Stat. 119 (2010), which amended the FCA's public disclosure bar, effective March 23, 2010. *United States ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 809 (11th Cir. 2015). Before this amendment, the FCA's public disclosure bar "provided that 'no court shall have jurisdiction' over an action based on publicly disclosed allegations or transactions." *Id.* at 810 (quoting 31 U.S.C. § 3730(e)(4) (2006)). "The PPACA amended this section, which now provides that a 'court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim

were publicly disclosed' in certain enumerated sources." *Id.* (quoting 31 U.S.C. § 3730(e)(4) (2012)).  Based on the plain language of these versions, motions to dismiss based on the prior version of § 3730(e)(4) are jurisdictional in nature and are considered under Federal Rule of Civil Procedure 12(b)(1), whereas motions to dismiss based on the amended version of § 3730(e)(4) are considered under Rule 12(b)(6) for failure to state a claim.  *Osheroff*, 776 F.3d at 810-11. Analogous revisions to the Florida FCA became effective on July 1, 2013.  *See* Ch. 2013-104, Laws of Fla (amending the Florida FCA); § 68.087(3), Fla. Stat.[5]

2. **Both versions of the federal "public disclosure bar," and only the prior version of Florida's "public disclosure bar," apply to Relator.**

The Supreme Court has determined that the amended version of § 3730(e)(4) cannot be applied retroactively, because its application eliminates one or more defenses available in a *qui tam* suit.  *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 283 n.1, 130 S. Ct. 1396, 176 L.Ed.2d 225 (2010).  Thus, even though Relator filed this action in 2014, the prior version of the public disclosure bar – and its requirement of dismissal based on lack of jurisdiction – apply to all alleged conduct prior to March 23, 2010.  *See Osheroff*, 776 F.3d at 811 (applying the Rule 12(b)(1) jurisdictional analysis to conduct alleged to have occurred prior to March 23, 2010, but the Rule 12(b)(6) standard to claims based on alleged conduct that occurred on or after March 23, 2010).  District courts throughout the country have applied the previous version of § 3730(e)(4) to conduct occurring prior to March 23, 2010, and the amended version to

---

[5] Prior to the amendment that became effective on July 1, 2013, the Florida FCA's "public disclosure bar" (§ 68.087, Fla. Stat. (2003)) provided that "[n]o court shall have jurisdiction over an action brought under this act based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing; in a legislative, administrative, inspector general, or Auditor General, Chief Financial Officer, or Department of Financial Services report, hearing, audit, or investigation; or from the news media, unless the action is brought by the department, or unless the person bringing the action is an original source of the information. For purposes of this subsection, the term 'original source' means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the department before filing an action under this act based on the information."

conduct thereafter, even though the lawsuit may have been filed after the effective date of the amendments.[6]

The relevant conduct for determining which FCA version applies is the submission of a false claim to the government, not the public disclosure of such fraudulent activity. *See United States ex rel. Osheroff v. Humana, Inc.*, No. 10–24486–cv–SCOLA, 2012 WL 4479072, at *4 n.8 (S.D. Fla. Sept. 28, 2012) ("[T]he previous version of the statute will apply to any alleged false claims made before March 23, 2010, and the amended version to any false claims made thereafter."), *aff'd*, 776 F.3d 805 (11th Cir. 2015).[7]

Because Relator's Complaint alleges false claims spanning from 1999 until February 2013, both versions of the Federal FCA's "public disclosure bar" apply to different portions of the Complaint, with March 23, 2010 as the dividing line. Accordingly, Defendants move to dismiss Counts under the federal FCA under Rule 12(b)(1) for all conduct subject to the prior version's jurisdictional bar, and under Rule 12(b)(6) for all conduct subject to the latter version's non-jurisdictional dismissal standard.

With respect to the Florida FCA, all of the Relator's claims allegations involve conduct prior to the amendment of the Florida FCA's public disclosure bar (which became effective July

---

[6] *See, e.g., Calisesi ex rel. United States v. Hot Chalk, Inc.*, No. CV–13–01150–PHX–NVW, 2015 WL 1966463, at *10 n.5 (D. Ariz. May 1, 2015); *United States ex rel. Bogina v. Medline Indus., Inc.*, No. 1:11–cv–05373, 2015 WL 1396190, at *2 (N.D. Ill. Mar. 24, 2015); *United States ex rel. John v. Hastert*, No. 1:13–cv–05014, 2015 WL 1006852, at *9 (N.D. Ill. Mar. 4, 2015); *United States ex rel. McGee v. IBM Corp.*, No. 1:11–cv–03482, 2015 WL 877458, at *7 (N.D. Ill. Feb. 26, 2015); *U.S. ex rel. Griffith v. Conn*, No. 11–157–ART, 2015 WL 779047, at *3 & n.1 (E.D. Ky. Feb. 24, 2015); *United States ex rel. Cause of Action v. Chi. Transit Auth.*, No. 12 CV 9673, --- F. Supp. 3d ----, 2014 WL 5333399, at *2 n.2 (N.D. Ill. Oct. 20, 2014); *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 69 F.Supp.3d 416, 2014 WL 4954296, at *5 (D. Del. Sept. 23, 2014).
[7] *See also United States v. Bd. of Educ. of City of Chi.*, No. 1:12–cv–00622, 2015 WL 1911102, at *7 (N.D. Ill. Apr. 27, 2015) (same); *United States ex rel. Cantekin v. University of Pittsburgh*, 192 F.3d 402, 409-11 (3d Cir. 1999) (concluding that the relevant conduct for retroactive application of the FCA's 1986 amendment is the claim submission date, not the disclosure date); *Makro Capital of Am., Inc. v. UBS AG*, 436 F. Supp. 2d 1342, 1346-47 (S.D. Fla. 2006) (the making of the false claim, not the date of disclosure, is the relevant event for purposes of the 1986 FCA amendment's retroactivity analysis).

1, 2013), and therefore Defendants move to dismiss the claims subject to the Florida FCA's "public disclosure bar" under Rule 12(b)(1).

### 3. Relator's claims are substantially barred by the public disclosure provisions.

There is a three-part test for deciding if the FCA's public disclosure provisions bar a *qui tam* lawsuit. *Osheroff*, 776 F.3d at 812 (citing *Cooper v. Blue Cross Blue Shield of Fla., Inc.*, 19 F.3d 562, 565 n. 4 (11th Cir. 1994)). The first step is to determine whether the allegations made by a relator have been publicly disclosed. *Id.* The second step depends on which version of § 3730(e)(4) applies. If the prior version applies, the Court asks whether the *qui tam* lawsuit is "based upon" the publicly disclosed information. *Id.* (quoting 31 U.S.C. § 3730(e)(4) (2006)). If the amended version of § 3730 applies, the Court asks whether the allegations in the *qui tam* lawsuit are "substantially the same" as the publicly disclosed information. *Id.* (quoting 31 U.S.C. § 3730(e)(4) (2012)). Once these questions are answered affirmatively, the Court proceeds to the third step and asks if the relator is an "original source" of the information contained in the *qui tam* complaint. *Id.*; *see also Cooper*, 19 F.3d at 565 ("A court reaches the original source question only if it finds the plaintiff's suit is based on information publically disclosed."). A *qui tam* lawsuit is prohibited unless the relator is an "original source." *Osheroff*, 776 F.3d at 812.

### a) Many of the Relator's allegations have been previously publicly disclosed.

The federal FCA enumerates certain categories of sources that are considered public. *Osheroff*, 776 F.3d at 812. "Before the 2010 amendments to the FCA, information disclosed in both federal and state court proceedings was considered publicly disclosed." *Id.* (citing *Graham Cnty.*, 559 U.S. at 283). "After the 2010 amendments, only information disclosed in federal court proceedings may be considered public disclosures." *Id.* (citing 31 U.S.C. § 3730(e)(4)(A)(i)

9

(2012)); *see also United States ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908, 917 (4th Cir. 2013).  With respect to the Florida FCA, the prior version of which applies to all claims here, public disclosures include "allegations or transactions in a criminal, civil, or administrative hearing; in a legislative, administrative, inspector general, or Auditor General, Chief Financial Officer, or Department of Financial Services report, hearing, audit, or investigation; or from the news media."  § 68.087, Fla. Stat. (2003).[8]

Defendants attach hereto two prior state court complaints and a prior federal court complaint against Health First entities, the pertinent allegations of which are summarized in the Appendix attached as Exhibit A, to demonstrate that many of the allegations in Relator's *qui tam* Complaint have been previously disclosed to the public by another source.  The prior complaints themselves are attached as Exhibits B, C and D.  The state court complaints are captioned *Wuesthoff Health Systems, Inc. v. Health First, Inc., et al.*, Case No. 05-2007-CA-019391 (Fla. Cir. Ct.) (the "Wuesthoff Complaint"), filed on November 2, 2007 (Exhibit B), and *Hynes, et al. v. Health First, et al.*, Case No. 05-2007-CA-19182 (Fla. Cir. Ct.) (the "Hynes Complaint"), filed on August 12, 2009 (Exhibit C).[9]  The federal court complaint is captioned *Wuesthoff Health System, Inc. v. Health First, Inc., et al.*, Case No. 6:05-cv-01454-Orl-22JGG (M.D. Fla.) (the "Federal Complaint"), filed on September 29, 2005 (Exhibit D).[10]  A comparison of public disclosures in the prior actions of allegations in this case are as follows:

Relator's *qui tam* Complaint alleges that

---

[8] The Florida FCA's public disclosure bar was amended slightly in 2003 to substitute "Chief Financial Officer" for "Comptroller" and "Financial Services" for "Banking and Finance," but those changes are not material to this analysis.
[9] Although the Hynes Complaint is labeled as "Highly Confidential," the state court lifted that designation by order of October 19, 2009, at which time the Hynes Complaint became a public record.  (Ex. E at 2, ¶ 3.)  After substantial further proceedings including a related lengthy evidentiary hearing that covered over five days of testimony, the state court denied leave for Dr. Hynes to proceed under the amended version of his claims proposed in that complaint.
[10] The Court may take judicial notice of these complaints and properly consider them for purposes of this motion to dismiss.  *See Osheroff*, 776 F.3d at 811-12 & n.4 ("Courts may take judicial notice of publicly filed documents, such as those in state court litigation, at the Rule 12(b)(6) stage"); *Makro Capital of Am., Inc.* 543 F.3d at 1258 (allowing use of extrinsic evidence to assess evidence under Rule 12(b)(1) challenge).

- MIMA physicians were given opportunities to invest in new healthcare facilities, particularly the Melbourne Same Day Surgery Center and the Melbourne Gastro-Intestinal (GI) Center, in exchange for their loyal referrals to the Health First Defendants.  (Compl. ¶¶ 3, 49-67, 99-104.)

     These same allegations were made in the Hynes Complaint at ¶¶ 13, 108, 116-17, 153, and the Wuesthoff Complaint at ¶¶ 53, 60, 114.

- HFHP requires its plan participants to utilize Health First-related facilities, such as the Same Day Surgery Center and the GI Center, for outpatient services available at those facilities.  (Compl. ¶¶ 56-58, 65, 100-01.)

     This same allegation is made in the Hynes Complaint at ¶ 108.  Further, similar allegations that HFHP only contracts with loyal medical providers appear in the Hynes Complaint at ¶¶ 13, 103, and the Wuesthoff Complaint at ¶ 53.

- Health First has appointed MIMA physicians as medical directors of certain Health First facilities in exchange for exclusive referrals from these physicians. (Compl. ¶¶ 3, 59, 69, 89.)

     This same allegation was made in the Hynes Complaint at ¶¶ 108, 153, and the Wuesthoff Complaint at ¶¶ 60, 114-15.

- Health First gained control of the geographic area surrounding Viera Medical Park through restrictive covenants. (Compl. ¶¶ 97-98.)

     This allegation was similarly made in the Hynes Complaint at ¶ 100 and the Federal Complaint at ¶ 67.

- HRMC closed its radiation therapy facility and sold its equipment and released its personnel to MIMA.  (Compl. ¶ 77-78.)

     This same allegation was made in the Wuesthoff Complaint at ¶ 60.

- In exchange for their beneficial treatment, MIMA physicians were nearly 100% loyal to Health First. (Compl. ¶ 48.)

     This same allegation was made in the Hynes Complaint at ¶¶ 109, 154, the Wuesthoff Complaint at ¶¶ 61, 115, 116, 154, 155, and the Federal Complaint at ¶¶ 71, 103.

- HRMC did not pay Dr. Grenevicki for his on-call services, despite paying other physicians for the same on-call services.  (Compl. ¶ 88.)

This same allegation was made in the Hynes Complaint at ¶¶13, 120.

- MIMA physicians dropped their contracts with health insurance providers other than HFHP, in order to ensure MIMA's exclusive referrals to Health First hospitals.  (Compl. ¶ 96).

  This same allegation was made with regards to MIMA's termination of its contract with Aetna, as alleged in the Hynes Complaint at ¶ 155-56, the Wuesthoff Complaint at ¶¶ 116, 117, and the Federal Complaint at ¶ 72.

- Health First purchased MIMA at a price that significantly exceeded fair market value, in order to ensure exclusive referrals to Health First facilities.  (Compl. ¶¶ 90-91).

  This same allegation was made with regards to Health First's acquisition of other physician practices, as alleged in the Hynes Complaint at ¶ 106, the Wuesthoff Complaint at ¶ 58, and the Federal Complaint at ¶ 69.

Because the Hynes and Wuesthoff state court complaints were filed prior to the 2010 federal FCA amendment, the alleged conduct revealed by them is considered to have been publicly disclosed pursuant to the prior version of the federal FCA.  For this reason, the alleged conduct falls into the pre-2010 prohibition of any action based upon such disclosures, unless the Relator is an original source of such disclosures as defined by that pre-2010 version of the statute.[11]  *See* 31 U.S.C. § 3730(e)(4) (2006).  Furthermore, the Federal Complaint constitutes a public disclosure of the alleged conduct therein to preclude a *qui tam* action based on post-2010 conduct as well. Because only the pre-2013 version of the Florida FCA applies, the alleged conduct revealed by all three complaints is considered public disclosures barring jurisdiction under the Florida FCA. By offering the public disclosures in these former complaints with such identical allegations, the

---

[11] Under the prior version of § 3730, the plaintiff's knowledge must have been "direct and independent" for the plaintiff to qualify as an original source. 31 U.S.C. § 3730(e)(4)(B) (2006). Under the amended statute, an original source is someone who has "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions." 31 U.S.C. § 3730(e)(4)(B) (2012); *Osheroff*, 776 F.3d at 814-15.  Analogous changes were made to the Florida FCA, which became effective on July 1, 2013.

Defendants satisfy the first step of the inquiry, which is to show that the allegations made by the Relator have already been publicly disclosed.  *Osheroff*, 776 F.3d at 812.

**b)**  **Numerous allegations by Relator are based on or similar to those public disclosures.**

The second step of the inquiry assesses the relationship between the publicly disclosed information and the present *qui tam* Complaint.  Under the previous version of § 3730(e)(4), this step is satisfied if a relator bases "an FCA *qui tam* claim *in any part* on publicly disclosed information."  *Osheroff*, 776 F.3d at 814 (emphasis in original) (quoting *Battle v. Bd. of Regents*, 468 F.3d 755, 762 (11th Cir. 2006)).  Under the amended version, the Court must analyze whether the Complaint's allegations are "substantially the same" as the publicly disclosed information.  *Id.* (quoting 31 U.S.C. § 3730(e)(4) (2012)).   In practice, the courts look to whether the allegations are "substantially similar," *id.* at 814,[12] but importantly, the allegations of the *qui tam* complaint need not exactly match the public disclosure to be barred.  *United States ex rel. Gear v. Emergency Med. Assocs. of Ill.,* 436 F.3d 726, 729 (7th Cir. 2006) (citing GAO reports and medical news reports about improper Medicare billing as examples of public disclosures, even when they did not name the FCA defendant); *United States ex rel. Gilligan v. Medtronic, Inc.,* 403 F.3d 386, 389 (6th Cir. 2005) ("[W]e do not require specific disclosure of fraud to find public disclosure.").  Importantly, the second step is merely "a quick trigger to get to the more exacting original source

---

[12] This is consistent with the prior version of the FCA.  For a *qui tam* suit to be "based upon" a prior public disclosure, under the prior version, the publicly disclosed facts need only be substantially similar to the Relator's current allegations.  *See, e.g., United States ex rel. Barber v. Paychex, Inc.*, No. 09–20990–Civ, 2010 WL 2836333, at *8 (S.D. Fla. July 15, 2010) ("Relators also do not deny that their Complaint is 'based upon' these public disclosures, within the meaning of the FCA.  *See Cooper*, 19 F.3d at 567–68 (a relator's allegations are deemed to be 'based upon' a 'public disclosure'—and, thus, jurisdictionally barred—so long as they are 'supported by' the information publicly-disclosed)."); *see also United States ex rel. Ondis v. City of Woonsocket*, 587 F.3d 49, 57 (1st Cir. 2009) ("The majority view holds that as long as the relator's allegations are substantially similar to information disclosed publicly, the relator's claim is 'based upon' the public disclosure even if he actually obtained his information from a different source.") (citing *Cooper*, 19 F.3d at 567)).

inquiry." *Id.* (quoting *Cooper*, 19 F.3d at 568 n.10).

The *qui tam* Complaint here is plainly based, at least in part, on the publicly disclosed information discussed above.  The allegations in the Complaint are also substantially similar to the publicly disclosed information.  Considering that the second step is merely a "quick trigger," the significant overlap between Relator's allegations above and those made within the previously filed actions against Health First is sufficient to satisfy the second step, and these claims in Relator's Complaint must be dismissed for both lack of subject matter jurisdiction and failure to state a claim under the FCA, unless Relator can show that he is an "original source" of the publicly disclosed information.

### c) The Relator is not an original source of those allegations.

Under the prior version of § 3730, a relator's knowledge must have been "direct and independent" for the relator to qualify as an original source.  *Osheroff*, 776 F.3d at 814-15 (citing 31 U.S.C. § 3730(e)(4)(B) (2006)).  "Under the amended statute, an original source is someone who has 'knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions.'"  *Id.* at 815 (quoting 31 U.S.C. § 3730(e)(4)(B) (2012)).  Notably, "background information that helps one understand or contextualize a public disclosure is insufficient to grant original source status" under the prior version.  *Id.* (citing *McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.,* 501 F.3d 1244, 1253-54 (11th Cir. 2007); *Cooper*, 19 F.3d at 568).  Similarly, under the amended statute, a *qui tam* relator's information does not materially add to the public disclosures if those disclosures were already sufficient to give rise to an inference of illegality.  *Id.*

Here, Relator has failed to provide the Court with any specific facts showing that he had direct and independent knowledge of the publicly disclosed information on which he bases his

FCA claims, or even that he was in a position to obtain such direct and independent knowledge.[13] Relator states only that his allegations are based upon information he discovered through his work and through his own personal efforts, observations, and investigation.  (Compl. ¶ 17.)  This conclusory allegation is insufficient to show that Relator is an original source.  *See Battle v. Bd. of Regents for Ga.*, 468 F.3d 755, 762-63 (11th Cir. 2006) (the relator failed to provide facts to the district court that might establish herself as an original source of the information); *United States ex rel. Brown v. Walt Disney World Co.,* 361 F. App'x 66, 68 (11th Cir. 2010) ("Plaintiff provided nothing, other than her own conclusory allegation, to show that she was an original source of the information on which her complaint was based."); *Osheroff*, 776 F.3d at 815 ("At most, [Relator's] complaint adds background information and details relating to the value of the services offered, making it somewhat more plain that the clinics' programs could violate the AKS. However, background information that helps one understand or contextualize a public disclosure is insufficient to grant original source status under the previous version of the statute.").

Furthermore, Relator's allegations do not materially add to the publicly disclosed allegations, which already made the same allegations of illegality that Relator attempts to show here or disclosed facts from which such inferences could be made. *Osheroff*, 776 F.3d at 814-815. Accordingly, the allegations in Relator's *qui tam* action which were publicly disclosed cannot be saved by the original source exception.

---

[13] The only publicly disclosed information for which Relator offers a fact to show his direct and independent knowledge relates to the opportunity to invest in the Melbourne GI Center.  (Compl. ¶ 64.)  Even if Relator's phone call to Jerry Senne requesting an opportunity to invest in the GI Center – a request for which Relator was "rebuffed" – makes Relator an "original source" as to that allegation, there are no other facts alleged indicating an independent and direct connection between Relator and the other information disclosed by the public allegations.

### C.     The Complaint Fails to Satisfy the Requirements of Rule 9(b).

Claims asserted under the FCA are subject to the stricter pleading standards of Federal Rule of Civil Procedure 9(b) as they require fraud to be pleaded with a higher level of specificity. *Clausen*, 290 F.3d at 1308–09.   Rule 9(b) is satisfied only if a relator adequately pleads the following:

(1)     precisely what statements were made in what documents or oral representations or what omissions were made, and

(2)     the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and

(3)     the context of such statements and the manner in which they mislead the plaintiff, and

(4)     what the defendants obtained as a consequence of the fraud.

*United States ex rel. Carroll v. JFK Med. Ctr.*, No. 01–8158–CIV, 2002 WL 31941007, at *3 (S.D. Fla. Nov. 15, 2002) (dismissing *qui tam* complaint where, among other things, relator "fail[ed] to specify the dates when the fraudulent claims were made. Providing a six-year time span is not sufficiently particular to satisfy the Rule 9(b) particularity requirements.").   Because the "false claim" itself is the *sine qua non* of an FCA violation, dismissal is mandated even where a relator "provide[s] the 'who,' 'what,' 'where,' 'when,' and 'how' of improper practices, but he fail[s] to allege the 'who,' 'what,' 'where,' 'when,' and 'how' *of fraudulent submissions to the government*."   *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) (emphasis added). The same standards apply to claims under the Florida FCA.  *All Children's Health Sys., Inc.*, 2013 WL 1651811, at *5.  "[T]he Eleventh Circuit has recognized that while these requirements of Rule 9(b) may, in practice, make it difficult for a *qui tam* plaintiff to bring an action, they are necessary to prevent '[s]peculative suits against innocent actors for fraud' and charges of guilt by

16

association." *United States ex rel. Keeler v. Eisai, Inc.*, 568 Fed. App'x 783, 793 (11th Cir. 2014) (quoting *Clausen*, 290 F.3d at 1308).

Moreover, "[p]roceeding under the false certification theory … does not alleviate Relator's obligation to plead [his] case with particularity." *All Children's Health Sys., Inc.*, 2013 WL 1651811, at *3. "Without specific allegations of fraudulent certification, billing, or referral, inferences would have to be drawn for this complaint to state a claim, but inferences about the submission of fraudulent claims would strip[ ] all meaning from Rule 9(b)'s requirements of specificity." *Id.* at *4 n.3 (quoting *Corsello*, 428 F.3d at 1013 (internal quotation marks omitted)). Rule 9(b) equally applies to the allegations of conspiracy in Count II. *Corsello*, 428 F.3d at 1013-14. Similarly, Rule 9(b)'s requirements extend not just to allegations about the presentment of "false claims" themselves, but also to the underlying conduct which purportedly rendered them false. "Underlying schemes and other wrongful activities that result in the submission of fraudulent claims are included in the 'circumstances constituting fraud or mistake' that must be pled with particularity pursuant to Rule 9(b)." *Keeler*, 568 Fed. App'x at 793 (quotation omitted).

This requirement of specificity is especially critical in this case, where the Relator unleashes a barrage of general allegations regarding issues spanning fourteen years without ever specifying the particulars of the allegedly false claims. Given that most, if not all, of these allegations are based upon previously disclosed allegations, it becomes even more critical for Relator to state specifically what claims he is alleging are fraudulent and how he came to learn of such fraud. Without such specificity, Relator can potentially seek to avoid dismissal under the public disclosure bar. At the very minimum, such specificity is required to establish whether Relator is an original source. *Stennett v. Premier Rehabilitation, LLC,* 479 Fed. App'x 631, 633 (5th Cir. 2012) ("Plaintiff's amended factual allegations fail to allege, with the specificity required

by Rule 9(b) of the Federal Rules of Civil Procedure, that Plaintiff is the 'original source' of the information forming the basis of the complaint or that any of the Defendants acted with the requisite scienter to establish a cause of action under the [FCA].").

As further described below, the Relator has failed to allege false claims with the particularity required, and the Complaint must be dismissed on that ground alone.

### 1. There are no sufficient allegations of any "false claim."

Among its deficiencies with respect to particularity, the Complaint fails to state a claim on which relief can be granted when measured against the Rule 9(b) standards that apply under the FCA.

> The "central question" in a claim brought under the False Claims Act is "whether the defendant ever presented a 'false or fraudulent claim' to the government." *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1326 (11th Cir. 2009) (quoting *Clausen*, 290 F.3d at 1311). "Without the *presentment* of such a claim, while the practices of an entity that provides services to the Government may be unwise or improper, there simply is not actionable damage to the public fisc as required under the False Claims Act." *Clausen*, 290 F.3d at 1311. "The False Claims Act does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe." *Id.* The submission of a false claim is the *sine qua non* of a False Claims Act violation. *Id.*

*All Children's Health Sys., Inc.*, 2013 WL 1651811, at *2.

The Complaint does not even come close to making this threshold allegation that any Defendant presented any claim on any date for any service. Thus, even if the allegations sufficiently alleged a violation of the Stark Act or the AKS, which they do not, the Complaint still "provides the Court with no factual allegations that Defendants made any claim or certification to the Government that was in fact tainted by referrals made pursuant to those allegedly unlawful compensation arrangements." *Schaengold v. Mem'l Health, Inc.*, No. 4:11–cv–58, 2014 WL

7272598, at *16 (S.D. Ga. Dec. 18, 2014).[14] "The requirement of alleging the presentment of a false claim cannot be overcome by detailing other improper activity." *All Children's Health Sys., Inc.*, 2013 WL 1651811, at *1. The deficiency in allegations of "who" allegedly made these false claims is exacerbated by the Complaint's shotgun allegations against all "Defendants," without differentiation, and incorporation of all the background allegations into every count. The repeated use of the term "Defendants" without distinguishing among the multiple defendants is insufficient as a general matter of pleading, and is especially problematic here where Rule 9(b) requires particularity.[15] This type of scattershot pleading is the precise reason that the FCA requires particularity in pleadings.

Moreover, the Relator's inadequate assertions of "false claims" — exemplified by the allegations in paragraphs 6 and 7 that "Defendants knowingly billed federal health care programs

---

[14] *See also Barys v. Vitas Healthcare Corp.*, 298 Fed. App'x 893, 896 (11th Cir. 2008) ("The amended complaint alleges that the structure of Vitas' bonus system made it profitable to keep unqualified patients in the system. The compensation system provided cash bonuses to administrators who maintained high patient populations. However, without allegations of instances in which these administrators fraudulently re-certified patients under MHB, this assertion is insufficient to support an inference of fraud."); *Corsello*, 428 F.3d at 1014 ("Corsello argues that a pattern of improper practices of the defendants leads to the inference that fraudulent claims were submitted to the government, but we disagree. Because it is the submission of a fraudulent claim that gives rise to liability under the False Claims Act, that submission must be pleaded with particularity and not inferred from the circumstances.... Although we construe all facts in favor of the plaintiff when reviewing a motion to dismiss, we decline to make inferences about the submission of fraudulent claims because such an assumption would strip all meaning from Rule 9(b)'s requirements of specificity.") (quotation omitted); *Clausen*, 290 F.3d at 1312 ("[Relator] merely alleged that 'these practices resulted in the submission of false claims for payment to the United States.' No amounts of charges were identified. No actual dates were alleged. No policies about billing or even second-hand information about billing practices were described."); *United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 869 F. Supp. 2d 1336, 1341–42 (M.D. Fla. 2012) (dismissing *qui tam* complaint for failing to identify any false claims related to the scheme to overcompensate physicians or any false claims for reimbursement for patients who were referred by the allegedly overcompensated physicians); *United States v. Aggarwal*, No. 6:03-cv-117-Orl-31KRS, 2005 WL 6011259, at *6 (M.D. Fla. Feb. 10, 2005) ("Even assuming that claims were filed, however, Plaintiff fails to allege the names of the patients in whose name claims were filed, claim numbers, the dates of such claims, to whom the claims were made, and what any of the Defendants received as a result. The fact that Plaintiff notes that this allegedly fraudulent practice 'dat[es] back to January of 1998' is not sufficient, as it provides no particularity from which the Defendants could be put on notice.").

[15] *See Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001) ("The complaint is replete with allegations that 'the defendants' engaged in certain conduct, making no distinction among the fourteen defendants charged, though geographic and temporal realities make plain that all of the defendants could not have participated in every act complained of."); *Kabbaj v. Obama*, 568 Fed. App'x 875, 880 (11th Cir. June 13, 2014) (finding improper shotgun pleading where "the complaint refers to the defendants collectively, making it impossible to identify which particular defendant engaged in what allegedly wrongful conduct").

for claims which were tainted by violations of the AKS and the Stark Act and directly violated the FCA," and that "[t]he amount overbilled to the federal health care programs could be at least $100 million in damages per year" — precisely mirror the sorts of all-encompassing and conclusory allegations that have been found especially deficient.  In *All Children's Health Systems, Inc.*, the court dismissed the *qui tam* complaint stating, "[a]t its essence, Relator's theory is that *every claim submitted* by ACH since Defendants began aggressively recruiting and overpaying physicians *is false* because the compensation scheme violates the Stark Amendment and the Anti–Kickback Statute.  Indeed, Relator characterizes her theory of liability as 'an *underlying statutory violation that taints all resulting claims.*'"  2013 WL 1651811, at *1 (emphasis added).  The instant Complaint, which advances the same general "tainted" claim theory, should be dismissed for the same reason.

### 2.    There is no indicia of reliability about the Relator's knowledge of claims.

To be sure, "[i]n certain instances, relators are excused from identifying specific false claims, certifications, or referrals if the court can infer an 'indicia of reliability' from the relator's position or circumstances."  *All Children's Health Sys., Inc.*, 2013 WL 1651811, at *2.  For instance, reliability may be established where a relator works in the "very department where [the] alleged the fraudulent billing scheme occurred."  *Id.* (citing *Hill v. Morehouse Med. Assocs., Inc.*, 82 Fed. App'x 213, 2003 WL 22019936 at *4 (11th Cir. 2003)).  But the Relator in this case does not allege, nor could he, that he worked in the "very department" which prepared the allegedly fraudulent claims, and indeed does "not even work for the same company that is alleged to have presented the false claims."  *All Children's Health Sys., Inc.*, 2013 WL 1651811, at *2.[16]

---

[16] *See also United States ex rel. Sanchez v. Lymphatic, Inc.*, 596 F.3d 1300, 1303 (11th Cir. 2010) ("Despite her assertion that she had direct knowledge of the defendants' billing and patient records, however, Sanchez failed to provide any specific details regarding either the dates on or the frequency with which the defendants submitted false claims, the amounts of those claims, or the patients whose treatment served as the basis for the claims. Without these

Rather than alleging facts supporting an indicia of reliability, the Relator asserts that the Complaint is "based upon information discovered through his work and through his own personal efforts, observations and investigations." (Compl. ¶ 17.)  The law is clear in this Circuit, however, that such "an assertion of personal knowledge cannot provide [relator's] conclusory allegations with the indicia of reliability necessary to support a claim for fraud under Rule 9(b)." *Barys v. Vitas Healthcare Corp.*, 298 Fed. App'x 893, 895 (11th Cir. 2008) (affirming dismissal).  Even the allegations of corporate insiders are lacking where they can allege no basis of knowledge for the billing practices themselves.[17]  Indeed, in the few instances where the Relator attempts to allege some limited facts related to his knowledge of purportedly unlawful practices, for instance because he served as a medical director of HF Hospice sixteen years ago (that is, nine years beyond the statute of limitations period) (Compl. ¶ 112), those allegations are immaterial to his allegations of fraudulent billing.[18]  This is especially true here since claims made before March 2008 are not actionable at all.

In short, under the well-settled law of this Circuit, the Relator has not come close to alleging "false claims" with the particularity required to survive dismissal under Rule 9(b).

---

or similar details, Sanchez's complaint lacks the 'indicia of reliability' necessary under Rule 9(b)...."); *Mastej*, 869 F. Supp. 2d at 1344 (finding allegations by a relator working in an executive position in the defendant corporation to lack indicia of reliability because the relator made "no allegations that he had any familiarity, through his various roles with the defendants and subsequent to his tenure with the defendants, with the billing practices of the defendants").

[17] *Corsello*, 428 F.3d at 1013–14 ("Although Corsello worked in sales, his allegations ... lacked the 'indicia of reliability' required by *Clausen* because they failed to provide an underlying basis for Corsello's assertions."); *Britton v. Lincare, Inc.*, No. 2:13–cv–00742–SGC, 2015 WL 1487134, at *4 (N.D. Ala. Mar. 30, 2015) (dismissing complaint with prejudice after rejecting relator's "speculative, conclusory allegations" that that "on information and belief" the defendant billed Medicare for patient services relator performed).

[18] *Clausen*, 290 F.3d at 1312 (affirming dismissal of FCA complaint and stating "[i]n none of relator's descriptions of alleged schemes by LabCorp to increase its testing and testing revenues—which are accompanied by dozens of pages of exhibits—does [relator] provide any factual basis for his conclusory statement tacked on to each allegation that bills were submitted to the Government as a result of these schemes…"); *United States ex rel. Butler v. Magellan Health Servs., Inc.*, 101 F. Supp. 2d 1365, 1369 (M.D. Fla. 2000) (dismissing FCA complaint even where plaintiff "does plead a fraudulent scheme of conduct which may well be prohibited by law" but does not plead "any specific occurrences of a false claim"); *All Children's Health Sys., Inc.*, 2013 WL 1651811, at *1 ("The requirement of alleging the presentment of a false claim cannot be overcome by detailing other improper activity.").

**D.** **Each of the different activities and theories alleged by the Complaint fails to establish a claim on which relief can be granted under Rule 12(b)(6) for the reasons above and others.**

A review of each of the activities alleged in the Complaint shows that they all must be dismissed based on the principles outlined above as well as for other reasons specific to each of the allegations. As noted above, "[u]nderlying schemes and other wrongful activities that result in the submission of fraudulent claims are included in the 'circumstances constituting fraud or mistake' that must be pled with particularity pursuant to Rule 9(b)." *Keeler*, 568 Fed. App'x at 793 (quotation omitted). The allegations that Defendants violated the FCA based on underlying violations of the AKS, the Stark Act, or other legal requirements must be dismissed for the following reasons.

**1.** **Alleged FCA violations based on the Anti-Kickback Statute ("AKS") (Compl. ¶¶ 48-98)**

The Complaint alleges a series of activities which Relator contends violated the AKS. (¶¶ 48-98). "Generally speaking, the Anti-kickback statute prohibits a hospital from financially inducing a person to refer a Medicare patient." *Mastej*, 591 Fed. App'x at 698 (citing 42 U.S.C. § 1320a–7b(b)). "[T]he Anti-kickback statute forbids knowingly 'offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person ... to refer an individual [for medical services] for which payment may be made in whole or in part under a Federal health care program' such as Medicare." *Id.* (quoting 42 U.S.C. § 1320a–7b(b)(2)(A), and citing 42 U.S.C. § 1320a–7b(b)(3) (providing exceptions to this general rule)). "A violation of the Anti-kickback statute occurs when the defendant (1) knowingly and willfully, (2) pays money, directly or indirectly, to doctors, (3) to

22

induce the doctors to refer individuals to the defendants for the furnishing of medical services, (4) paid for by Medicare." *Id.* (citing *United States v. Vernon*, 723 F.3d 1234, 1252 (11th Cir. 2013)).

### a)      Allegations concerning MSDS (Compl. ¶¶ 48-61)

The Complaint (¶¶ 48-61) attempts to allege an AKS violation related to an outpatient ambulatory surgical center called Melbourne Same Day Surgery, Inc. ("MSDS"), which is not named as a defendant.  For a variety of reasons these allegations fail to state a claim.  First, the allegations of false claims submitted more than six years ago are barred by the statute of limitations. *See* § III.A *supra*.  Second, the allegations based on public disclosures from other sources are subject to the public disclosure bar.  *See* § III.B.3(a) *supra*.  Third, the allegations do not relate to false claims allegedly made by any of the Defendants.  The Complaint itself alleges that the referrals which were purportedly being induced by offers of partnership interests were referrals *to MSDS* and not to any of the Defendants:  "Larry Garrison, COO of Health First … expressed the understanding that any investor [in MSDS] would be required to refer all of his or her patients to the surgery center and nowhere else."  (Compl. ¶ 54.)  MSDS is not a party to this action, and claims presented to the United States by MSDS, if any, are not the subject of this Complaint.

In addition, although the Complaint alleges that investors paid for the investment interests, the Complaint does not allege that the payments were less than the fair market value of the investment interests or that any dividends or returns on the investment interests were unreasonable or excessive. Therefore, the Complaint fails to allege that the sale of the partnership interest constituted "remuneration" under the AKS.  Furthermore, Relator does not allege that any of the Defendants paid the dividends. For all of these reasons, the Complaint fails to state a claim under the AKS.

### b)  Allegations concerning Melbourne GI Center (Compl. ¶¶ 62-67)

The Complaint alleges (¶¶ 62-67) that Health First also used a joint venture, Melbourne GI Center ("MGIC"), to induce referrals from physicians.  The allegations are essentially that physicians and practices who were not willing to exclusively refer patients for gastrointestinal ("GI") procedures to MGIC were not offered shares in that ambulatory surgical center.  First, the allegation involves the offering of shares in MGIC in 2002, far outside the statute of limitations.  *See* § III.A, *supra.* And second, these claims have been publicly disclosed by other sources.  *See* § III.B.3(a), *supra*.   Therefore, there is no need for the Court to analyze the claims further.  In any event, MGIC also is not a Defendant, and therefore there is no allegation of false claims by any Defendant based on the sale of the MGIC partnership interests.

The allegations also do not satisfy the Rule 9(b) particularity requirements.  For instance, there is no allegation as to which non-MIMA physicians were not permitted to purchase units because they refused to agree to refer their patients exclusively to MGIC.   Nor are there any allegations as to the "who," "what," and "where" of physicians who supposedly did agree to do so, or how the Relator would know any of this information.  *Hopper*, 588 F.3d at 1324.

### c)  Allegations regarding medical directorships at Hospice of Health First (Compl. ¶¶ 68-73)

The Complaint alleges kickbacks related to medical directorships of Hospice of Health First (¶¶ 68-73), but these allegations are imprecise in terms of the time frame and as to the identities of the patients referred to Hospice of Health First. Therefore, these allegations fail to meet the particularized pleadings requirements under Rule 9(b).  The allegations also leave unclear which entity is alleged to have paid the stipends: is the Relator asserting that Health First, Inc. paid the stipends, or that HF Hospice or some other entity paid them? If the allegation is that HF Hospice paid the stipends, then there is no FCA violation alleged because HF Hospice is not a

Defendant.  Paragraphs 72 and 73 allege that patients who were treated at Health First hospitals were steered to Hospice of Health First only, but these allegations likewise state no violation of the AKS.

### d)      Allegations regarding Palm Bay Community Hospital (Compl. ¶¶ 74-75)

The Complaint alleges (¶¶ 74-75) that in 2002 Health First created an "Admitting Program" for MIMA internists to take call at Palm Bay Community Hospital, in order to encourage MIMA physicians to remain on the medical staff of that hospital.  These allegations fail to state a claim because they do not allege that that the program existed after March 27, 2008, which would be the cut-off for the statute of limitations.  *See* § III.A *supra*.  Nor does the Complaint allege that these payments were in excess of fair market value for the call coverage services provided.  Once again, these allegations fail to meet the requirements of Rule 9(b).

### e)      Allegations regarding MIMA's radiation therapy facility (Compl. ¶¶ 76-78)

The Complaint alleges (¶¶ 76-78) that in 2003 HFHP agreed to reimburse MIMA for services at MIMA's radiation therapy facility, apparently on an exclusive basis.  Again, there is no allegation that the practice continued beyond March 2008 so as not to be time-barred. *See* § III.A *supra*.  The claim also fails under the public disclosure bar.  *See* § III.B.3(a) *supra*.   In addition, these allegations again fail to allege false claims with any particularity as required under Rule 9(b), by failing to allege what claims were presented by what Defendant and when, or how the Relator would have direct and independent knowledge of any such claims.

### f)      Allegations that Health First provided extra services to MIMA physicians (Compl. ¶¶ 79-81)

The Complaint (¶¶ 79-81) alleges that from 2000 to 2013, HRMC provided MIMA physicians exclusive use of Health First-employed hospitalist physicians to relieve MIMA

physicians from taking unreimbursed phone calls from hospital nursing staff and from MIMA outpatients during evenings and weekends, and that HRMC provided hospitalists to admit MIMA patients during evenings and weekends. First, much of the alleged time frame is outside of the statute of limitations. *See* § III.A *supra*. And again, there are no particular allegations under Rule 9(b) of false claims, as required, or of how the Relator would have direct and independent knowledge of any such false claims. Moreover, the Complaint fails to allege how HRMC's employment of hospitalists constituted a violation of the AKS.

> **g)** **Allegations concerning free blood products to induce referrals (Compl. ¶¶ 82-85)**

The Complaint alleges (¶¶ 82-85) that Health First provided free blood products to physicians. First, the allegation that this occurred "until approximately 2010" (Compl. ¶ 83) is contradicted by the more specific subsequent allegation that "Health First ceased supplying blood products at no cost effective January 1, 2008" (Compl. ¶ 119). Thus, the claim is time-barred and the Court need not analyze it further. *See* § III.A *supra*.[19] Even beyond that problem, the Relator makes no adequate allegation of false claims submitted by any Defendants as required under Rule 9(b).

Furthermore, the decision by Health First to "cease supplying blood products at no cost" and to shut down the blood infusion program at HRMC was widely publicized. The Complaint admits that the legal opinion Health First received from outside counsel that the program violated state and federal law was "widely distributed" internally at Health First "with permission to distribute it freely." (Compl. ¶ 84). The Complaint later recites in detail the public debate over the decision in December 2007, effective January 2008, to close the outpatient infusion center and to

---

[19] Indeed, the allegation that a legal opinion that the provision of free blood products constituted a potential violation of the AKS was obtained and widely distributed by Health First (Compl. ¶ 84), is consistent with the allegation that Health First stopped supplying blood products at no charge in January 2008 (Compl. ¶¶ 116, 119).

cease the practice of supplying free blood products to physicians. (Compl. ¶¶ 116-125). Clearly, these facts upon which Relator bases his allegations were in the public domain years ago, and he is not an original source of such information.   These allegations are subject to dismissal under the "public disclosure bar."

<b>h)    Allegations of other exclusive benefits to MIMA physicians<br>(Compl. ¶¶ 86-89)</b>

The Complaint (¶¶ 86-89) alleges that, dating back to 2004, HFHP provided MIMA physicians other "exclusive benefits," such as allowing MIMA doctors to use MIMA's radiation therapy facilities while refusing to reimburse other practices that used their own facilities (no date provided); contracting only with MIMA for cardiac catheterization services (between 2004 and 2013); providing MIMA doctors with more opportunities to take call at HRMC (for which MIMA doctors were compensated) (no date provided); and appointing MIMA doctors as medical directors, "paying them exorbitant stipends for little or no work" (no date provided).   This "grievance box" of complaints fails to provide the requisite specificity regarding which false claims were made, by whom, and when. Nor does the Complaint identify which referrals to which institution were "induced" by any alleged remuneration.   Moreover, allowing MIMA to use MIMA's own facilities and then reimbursing MIMA for use of such facilities is not a "remuneration" in cash or in kind, since there is no allegation that more than fair market value was paid.  The Relator's objection seems to be that <u>his</u> medical practice did not get the same treatment. However, these allegations fail to specify any basis upon which such exclusive arrangements violate the AKS or otherwise to state a claim for violation of the AKS.   The Relator makes no allegation that physicians were paid more than fair market value for any services they rendered, but only that that he and other physicians did not receive the same opportunity to get paid to

provide such services.  The AKS does not prohibit a health plan or a hospital from contracting with a particular physician or physician group and not contracting with another.

Regarding the appointment of MIMA doctors as medical directors, the Relator asserts, only in a conclusory fashion, that they were paid "exorbitant stipends for little or no work." But Relator fails to allege the amount of any such stipends, the basis upon which Relator asserts that the stipends were "exorbitant," or any facts that would establish that Relator was in a position to have direct and independent knowledge of the amount of such stipends or the services rendered in return for such stipends.  Finally, the allegations in Paragraph 89 must be dismissed under the public disclosure bar.  *See* § III.B.3.(a) *supra*.

### i)     Allegations that Health First acquired MIMA for more than fair market value (Compl. ¶¶ 90-96)

The Complaint alleges (¶¶ 90-96) that Health First made excessive payments to MIMA physicians for the purchase of the MIMA group practice in 2013.  Again, however, there are no particularized allegations of false claims that were made.  Nor does the Relator provide facts to show how he had independent knowledge of such claims or of the alleged purchase price.  In addition, substantially similar allegations regarding the purchase by Health First of other physician practices to ensure exclusive referrals have been made in prior complaints by other sources, and these claims should be barred on that basis alone.  *See* § III.A *supra*.

### j)     Allegations that Health First sells "Geographic Exclusivity" to certain physician subspecialty groups (Compl. ¶¶ 97-98)

The legal theory underlying paragraphs 97 and 98 is particularly unclear.  The two physician practices in question allegedly overpaid Health First for space leased from Health First in exchange for patient referrals from the hospitals.  Allegations regarding Health First's unlawful use of restrictive covenants in Viera have been previously publicly disclosed by other sources, and

these claims are therefore barred.  *See* § III.B.3(a) *supra.*   The allegation in Paragraph 97 also relies on a contract entered into in 2007 or earlier, which is barred under the statute of limitations. *See* § III.A *supra.*   In addition to those problems, there is no allegation of what the false claims were or who made the alleged false claims.  The allegations also do not identify any specific physicians or physician groups that leased space and do not identify any specific leases or the dates they were entered into, and they certainly do not allege that any of Defendants presented false claims.

### 2. Alleged FCA violations based on the Stark Act (Compl. ¶¶ 99-104)

The only alleged violations of the Stark Act against any of the Defendants are asserted in paragraphs 99 to 104.  First, these involve predominantly the same allegations as Sections A.1 and A.2 and are barred or limited by the statute of limitations.  *See* § III.A *supra.*   Likewise, these claims must be dismissed under the public disclosure bar.  *See* § III.B.3(a) *supra.*   Moreover, these paragraphs fail to describe any unlawful conduct and should be dismissed under Rule 9(b) and Rule 12(b)(6).  To the extent that any other allegations of the Complaint are intended to suggest a violation of the Stark Act, they too fail to state a claim.

These paragraphs allege violations of the Stark Act consisting of what Relator calls "referrals" from HFHP or MIMA to MSDS or MGIC. But in none of these allegations does the Relator identify any referral by a specific physician, any referral for designated health services ("DHS"), or any claim submitted by any of the Defendants for designated health services rendered as a result of a prohibited referral.

In these paragraphs, the Relator's allegations exhibit a profound and fundamental lack of understanding of the Stark Act and its implementing regulations.  First, the Stark Act prohibits a *physician* (not an entity) who has a direct or indirect financial relationship with an entity from

making referrals to that entity, unless an exception applies.  *See* 42 CFR § 411.353(a).  Contrary

to the Complaint's allegations, the Stark Act does not prohibit any of the alleged "referrals" from

any of the named Defendants because they are not "physicians."   Second, the referrals that the

Stark Act prohibits (if a "financial relationship" exists and no exception applies) are referrals by a

physician to an entity for the furnishing of one of a limited number of *designated health services*

for which payment may otherwise be made under Medicare (not "any" item or service).  *Id.*

(emphasis added). "Designated health services" are defined at 42 CFR § 411.350.  *See also* 42

U.S.C. § 1395nn(h)(6); 42 CFR § 411.351.[20]  Nowhere in the Complaint does Relator allege that

any referrals were made for furnishing any "designated health services."  For example, hospice

services are not included in the definition of "designated health services."   Neither MSDS nor

MGIC  are defendants in this case. But even if they were, the Complaint does not allege that either

MSDS or MGIC provided any "designated health services." Accordingly, none of the alleged

referrals to MSDS or MGIC, nor any referrals to Health First Hospice, violated the Stark Act

because they were not for "designated health services."   Further, nowhere in the Complaint does

Relator allege facts that are sufficient to establish the existence of a prohibited "financial

relationship" (as that term is defined in the Stark Act and its implementing regulations) between

any physician and any Defendant.

        Moreover, the Counts asserting FCA claims on the basis of the Stark Act (Counts III and

V) allege claims against all the "Defendants" in this case, but HFHP and MIMA are the only

---

[20] "The term 'designated health services' means any of the following items or services:  (A)   Clinical laboratory services. (B)   Physical therapy services. (C)   Occupational therapy services. (D)   Radiology services, including magnetic resonance imaging, computerized axial tomography scans, and ultrasound services. (E)   Radiation therapy services and supplies. (F)   Durable medical equipment and supplies. (G)   Parenteral and enteral nutrients, equipment, and supplies. (H)   Prosthetics, orthotics, and prosthetic devices and supplies. (I)   Home health services. (J)   Outpatient prescription drugs. (K)   Inpatient and outpatient hospital services. (L)   Outpatient speech-language pathology services." 42 U.S.C. § 1395nn(h)(6)

Defendants named in the specific Stark-related allegations in those counts, Counts III and V. Therefore, the allegations of those two counts must be dismissed as to the other defendants.

The Complaint also alleges (¶¶ 100-101) that HFHP's statement in 2006[21] that it would not contract with Sheridan Surgery Center violated 42 U.S.C. § 1395a by denying patient freedom of choice.  But Section 1395a — the "freedom of choice provision"[22] — only "bars interference by the Secretary of Health and Human Services (or his subordinates in the administration of the Medicare program) with a beneficiary's selection of a physician."  *MacArthur v. San Juan Cnty.*, 416 F. Supp. 2d 1098, 1141-42 (D. Utah 2005).  It simply does not apply to any of the Defendants.[23]  As in *MacArthur*, the argument must be rejected because nothing in the Complaint "suggests that the Secretary, Medicare program officials — or anyone else involved in HHS administration of Medicare benefits — attempted to interfere with [a patient's] choice of health care providers from among those qualified to participate in the Medicare program." 416 F. Supp. 2d at 1141-42.

### 3.    Alleged FCA violations outside of the Stark Act and the AKS (Compl. ¶¶ 105-107)

Paragraphs 105 to 127 do not allege violations of either the Stark Act or the AKS, but rather purport to allege that "Health First knowingly and directly presented false claims to the government."  There is no specific allegation, however, that Health First directly submitted any claims to the government, and therefore these claims must fail entirely on that basis alone.  The allegations in these paragraphs also are time-barred as they all occurred well prior to March 27,

---

[21] The statement was allegedly made on March 9, 2006, which is two years outside the statute of limitations period.
[22] "This statute, the so-called Medicare 'freedom of choice provision,' reflects one of the fundamental principles upon which the Medicare program was founded, and guarantees Medicare beneficiaries the freedom to choose health care providers, who would then be paid by Medicare at the program's prescribed rates."  *MacArthur v. San Juan Cnty.*, 416 F. Supp. 2d 1098, 1141-42 (D. Utah 2005).
[23] Moreover, there is no private right of action under 42 U.S.C. § 1395a.  *Mays v. Hosp. Auth.*, 582 F. Supp. 425, 430–31 (N.D. Ga. 1984).

2008. Furthermore, all of these claims are based on facts which were clearly disclosed to the public at large, as the allegations themselves make evident.  The Relator cannot be an original source of this information, and therefore these allegations are subject to dismissal under the public disclosure bar as well.

> ### a)     Allegations concerning PET scans (Compl. ¶¶ 105-111) do not state a claim on which relief can be granted

The Complaint (¶¶ 105-111) alleges that HRMC improperly discharged inpatients needing PET scans so that the patients could receive the PET scans as outpatients, and that this was done to increase the hospital's profits. (Compl. ¶¶ 106-109.)  This claim must be dismissed, however, because the allegation that "upon information and belief, these PET scans were billed to, and paid by, government insurance programs" (Compl. ¶ 111) plainly fails under Rule 9(b).  *See, e.g., Britton v. Lincare, Inc.*, No. 2:13–cv–00742–SGC, 2015 WL 1487134, at *4 (N.D. Ala. Mar. 30, 2015) (dismissing complaint with prejudice and stating that "[i]n fact, Britton does not even affirmatively allege Lincare actually submitted a false or fraudulent claim for Medicare or Medicaid reimbursement. Rather, he alleges '[u]pon information and belief,' Lincare bills Medicare for patient education services he performs, and '[t]o the extent' Lincare bills Medicaid for patient education, he performs those services….  These speculative, conclusory allegations are plainly insufficient to state a claim against Lincare pursuant to § 3729(a)(1) (1994)) (citing *Corsello*, 428 F.3d at 1013–14 (relator's allegations, "often based 'on information and belief,' "lacked indicia of reliability because they failed to provide underlying basis for relator's assertions)); *Clausen*, 290 F.3d at 1311 (allegations a false or fraudulent claim "must have been

submitted, were likely submitted or should have been submitted to the Government" fail to satisfy Rule 9(b)).

> b)    **Allegations concerning Hospice patients (Compl. ¶¶ 112-115) do not state a claim on which relief can be granted**

Relator alleges (¶¶ 112-115) that Health First received a capitated daily rate from Medicare for services provided to patients of Health First Hospice, but temporarily dis-enrolls those patients from its Hospice when they need in-hospital care in order to bill Medicare on a fee-for-service basis for services like radiation or palliative chemotherapy rather than deducting them from the amount allotted for hospice care.  (Compl. ¶¶ 113-114.)  Again, there is no particular allegation of "false claims" being submitted, but rather only an allegation that accurate claims were submitted, i.e., claims for inpatient services having been rendered which in fact were rendered. Nor is there any date provided relating to these allegations other than 1999, well outside the statute of limitations.

The Relator also contends that these alleged practices of HF Hospice violate "Medical rules for the hospice industry as defined in the Federal Register Vol. 64 No. 192 Oct. 5, 1999 pp. 54031-54049."  (Compl. ¶ 115.)   The cited Federal Register notice (the "Notice"), however, merely "promote[s] voluntarily developed and implemented compliance programs" for hospices and thus provides "a set of guidelines to be considered by a hospice interested in implementing a compliance program."   64 Fed. Reg. at 54032.[24] Among these, the Department of Health and Human Services recommends that "[t]o satisfy the applicable Medicare conditions of participation in the nursing home context, hospices should implement [certain] policies and procedures."  *Id.* at 54039.  "The success of a false certification claim depends on whether it is based on 'conditions of participation' in the Medicare program (which do not support an FCA claim) or on 'conditions

---

[24] This provision is available electronically at http://www.gpo.gov/fdsys/pkg/FR-1999-10-05/pdf/99-25787.pdf.

of payment' from Medicare funds (which do support FCA claims)."  *United States ex rel. Hobbs v. MedQuest Assocs., Inc.*, 711 F.3d 707, 714 (6th Cir. 2013).  Thus, various Medicare rules that do not expressly state that an item is a "condition for payment" cannot form the basis of an FCA claim.  *United States ex rel. Bierman v. Orthofix Intern., N.V.*, No. 05–10557–RWZ, 2015 WL 4197551, at *8 (D. Mass. July 1, 2015).  Far from being either an actionable "condition of payment" or a non-actionable "condition of participation," the set of guidelines alleged by Relator is merely a recommendation for voluntary practices that might improve compliance with "conditions of participation."  64 Fed. Reg. at 54039.  Contrary to the Complaint's assertions, "[t]he False Claims Act is not a vehicle to police technical compliance with complex federal regulations," *MedQuest Assocs., Inc.*, 711 F.3d at 717, much less a vehicle to assign liability for alleged failure to comply with a federal agency's "recommendations and guidelines" where the agency expressly states that their "applicability … depends on the circumstances of each particular hospice."  64 Fed. Reg. at 54032.

**c)**    **Allegations concerning required blood transfusions (Compl. ¶¶ 116-125) do not state a claim on which relief can be granted**

The Complaint alleges (¶¶ 116-125) that Health First improperly required patients to receive blood transfusions as inpatients.  As noted above, the Complaint specifically alleges (¶¶ 116-119) that Health First ceased providing free blood products as of January 1, 2008 (not 2010 as alleged in Compl. ¶ 83), and began charging physicians for blood.  But here, the Complaint now claims that Health First charged "exorbitant" rates for blood, which "disincentivized" physicians from providing blood services themselves.  (Compl. ¶¶ 116-17.)  The Complaint also alleges that HRMC's outpatient infusion center was closed in conjunction with the opening of an outpatient transfusion center at Palm Bay Hospital, but that the Palm Bay transfusion center was 25 miles away and therefore less convenient to the patients in HRMC's area, and which was staffed three

34

days a week.  (Compl. ¶ 118.)  As such, the Complaint alleges that there was only one alternative: referring patients for transfusions to "Health First hospitals" (though that would include Palm Bay Hospital).  Thus, the Complaint essentially alleges that Health First should have made the blood cheaper (even though paragraph 84 of the Complaint goes to great lengths to assert that it must be charged at fair market value), but that since the blood was not priced at the rate Medicare would reimburse and because the Palm Bay facility was 25 miles away, patients were forced to be admitted to HRMC for transfusions.  This allegedly resulted in "patients being charged more for blood and/or the administration of blood products than they otherwise would have been charged," (Compl. ¶ 121).  But there is no allegation that the claims presented for such services or such products were false, nor is there any supportable allegation that Health First was legally obligated to open and maintain two outpatient transfusion centers, charge less for the blood, or take any of the other steps Relator argues would have been better.  If Health First was overcharging for blood products, certainly less expensive alternatives would have emerged.  And if the prices Health First charged for blood were unlawful, why has no one else complained?  The prices are not secret.  The Relator is attempting to turn the FCA into an all-purpose act to cure what he deems to be competitive disadvantages.

Furthermore, as noted above, the Complaint recites in detail the widespread public debate over the decision to close the outpatient infusion center at HRMC and cease providing free blood. (¶¶ 119-123.)  Thus, the facts upon which any allegations of false claims were publicly disclosed and the Relator is not an original source of such information. These allegations are barred.

### d)      Allegations regarding quality assessment and reporting issues (Compl. ¶¶ 126-133) do not state a claim on which relief can be granted

The Complaint alleges (¶¶ 126-133) that Health First, HRMC and HFHP are violating the FCA by "wrongfully bill[ing] federal health care programs for a level of care that fails to meet

federal and state standards." (Compl. ¶126.)  Paragraph 126 specifically alleges that the legal

requirements at issue, including 42 CFR §§ 482.11 and 482.21,[25] are "conditions of participation"

in the Medicare program rather than "conditions of payment." (¶126.)[26] Again, "conditions of

participation" cannot form the basis of FCA claims.  *United States v. Amin Radiology*, No. 5:10–

cv–583–Oc–PRL, 2015 WL 403221, at *9 (M.D. Fla. Jan. 28, 2015) (collecting cases); *see also*

*MedQuest Assocs., Inc.*, 711 F.3d at 714, 717.[27]  This is also consistent with the general principle

that "[t]he False Claims Act does not create liability merely for a health care provider's disregard

of Government regulations or improper internal policies unless, as a result of such acts, the

provider knowingly asks the Government to pay amounts it does not owe." *All Children's Health*

*Sys., Inc.*, 2013 WL 1651811, at *2 (quoting *Clausen*, 290 F.3d at 1311).  In addition, these

regulations apply on their face only to hospitals, and therefore do not apply to HFHP.  Finally, in

most of the allegations in paragraph 127 there are no specifics as to the "who," "when," "where"

and "how" required under Rule 9(b), although certain of the allegations make clear that they arose

---

[25] 42 CFR § 482.11 provides that as a condition of participation for federal funding, "(a) The hospital must be in compliance with applicable Federal laws related to the health and safety of patients. (b) The hospital must be— (1) Licensed; or (2) Approved as meeting standards for licensing established by the agency of the State or locality responsible for licensing hospitals. (c) The hospital must assure that personnel are licensed or meet other applicable standards that are required by State or local laws." 42 CFR § 482.21 requires that as a condition of participation for federal funding a hospital implement and maintain a quality improvement program.

[26] Compare paragraphs 39 and 46, in which the Complaint alleges that compliance with the Stark Act and AKS are "conditions of payment."

[27] The court in *Amin Radiology* further noted that "[t]he only way to accept [relator's] theory of the case is 'by weaving together isolated phrases from several sections in the complex scheme of Medicare regulations' as well as portions of Florida statutes…. As the Sixth Circuit succinctly stated '[t]his cut-and-paste approach is not supported by the structure of the regulatory scheme, and it is not reasonable to expect Medicare [Medicaid, or Tricare] providers to attempt such an approach to statutory interpretation in their efforts to comply with the FCA.'" 2015 WL 403221, at *9 (quoting *Medquest Assocs., Inc.*, 711 F.3d at 714.)

well prior to March 27, 2008.  Nor does the Relator plead specific facts to establish how he could be an original source of these allegations.

### 4.     Allegations also lack specificity needed for "conspiracy" claim

In addition to all of the other reasons cited above, Count II's claim under 31 U.S.C. § 3729(a)(1)(C) must fail due to inadequate allegations of the purported "conspiracy."  The elements of an FCA conspiracy claim are that "(1) that the defendant conspired with one or more persons to get a false or fraudulent claim paid by the United States; (2) that one or more of the conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim."  *Corsello*, 428 F.3d at 1013–14.  Rule 9(b) also applies to the allegations of conspiracy.  *Id.*  There are no allegations of a conspiracy other than that "Defendants, acting in concert, conspired to knowingly present or cause to be presented, false or fraudulent claims to the United States for payment or approval."  (Compl. ¶ 136.)  This "bare legal conclusion is unsupported by specific allegations of any agreement or overt act," and requires dismissal of any conspiracy claim.  *Corsello*, 428 F.3d at 1013–14 (dismissing claim based on allegation that two parties "conspired to defraud the Government").

### <u>CONCLUSION</u>

For the foregoing reasons, the Defendants respectfully request that this Court dismiss the Complaint in its entirety with prejudice.

Respectfully submitted this 10th day of August, 2015.

HOLLAND & KNIGHT LLP

/s/ Jerome W. Hoffman
Jerome W. Hoffman
jerome.hoffman@hklaw.com
Florida Bar No. 0258830
Dominic C. MacKenzie
donny.mackenzie@hklaw.com

Florida Bar No. 705690
L.T. Lafferty
lt.lafferty@hklaw.com
Florida Bar No. 975575
Kevin W. Cox
kevin.cox@hklaw.com
Florida Bar No. 0034020
Holland & Knight LLP
50 North Laura Street, Suite 3900
Jacksonville, FL 32202
Tel:  904-353-2000
Fax:  904-358-1872

*Trial Counsel for Defendants Health First,
Inc., Health First Health Plans, Inc., Health
First Medical Group, Holmes Regional
Medical Center, Palm Bay Hospital, Cape
Canaveral Hospital, and Viera Hospital*

Mark L. Mattioli, Esq.
(*Pro hac vice* forthcoming)
MLMattioli@MDWCG.com
Pennsylvania Bar No. 57665
Marshall, Dennehey, Warner, Coleman &
Goggin
2000 Market Street
Suite 2300
Philadelphia, PA 19103
Tel: 215-575-2833
Fax: 215-575-0856

*Counsel for Melbourne Internal Medical
Associates, P.A.*

## CERTIFICATE OF SERVICE

I hereby certify that on August 10, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the counsel of record.

/s/ Jerome W. Hoffman
Attorney

#36920969_v3

38